**The HOPI TRIBE, Plaintiff–Appellee–Cross–Appellant,**

v.

**The NAVAJO TRIBE, et al., Defendants–Appellants–Cross–Appellees,**

v.

**UNITED STATES of America, et al., Defendants–Appellees.**

**Nos. 92–16448, 92–16510, 92–16839 and 92–16840.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 1994.

Decided Jan. 30, 1995.

Tim Atkeson, Arnold & Porter, Denver, CO, for plaintiff-appellee-cross-appellant, Hopi Tribe.

Bruce R. Greene, Greene & Meyer, Boulder, Colorado, for defendant-appellant-cross-appellee, Navajo Nation, et al.

Katherine W. Hazard, U.S. Dept. of Justice, Washington, DC, for defendants-appellees, U.S., et al.

Before: CHOY, POOLE and REINHARDT, Circuit Judges.

## OPINION

CHOY, Circuit Judge:

We have before us in these consolidated appeals and cross-appeals another in a series of disputes between the Hopi and Navajo tribes stemming from what was once characterized as "'the greatest title problem of the West.'" *Healing v. Jones,* 210 F.Supp. 125, 129 (D.Ariz.1962), *aff'd* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963) (per curiam).

The Navajo Nation appeals the district court's order enforcing an award to the Hopi Tribe under the Navajo–Hopi Settlement Act, Pub.L. No. 93–531, 88 Stat. 1712, 25 U.S.C. § 640d, *et seq.* (1980) (the Settlement Act). On the basis of an appraisal issued by the Bureau of Indian Affairs (BIA) and adopted by the Secretary of the Interior (the Secretary), the district court awarded the Hopi Tribe $586,803.60 (the homesite rental determination) for the fair market rental value of homesites occupied by Navajos between 1979 and 1984 in formerly shared lands after their partition and allocation to the Hopi Tribe.

The Navajo Nation appeals this award on the ground that the BIA and the Secretary arbitrarily disregarded relevant factors pertaining to the measurement and valuation of

homesite tracts and thereby abused their discretion under the Administrative Procedure Act, 5 U.S.C.A. § 706(2)(A) (1977 & Supp.1993) (the APA). We affirm the judgment of the district court denying the Navajo Nation's motion for review and granting the Hopi Tribe's motion for judgment upon and enforcement of the homesite rental determination.

The Navajo Nation further appeals the district court's denial of its motion for review of the BIA's determination of the fair market value of the Navajo Nation's post-partition use of Hopi lands for raising livestock between 1979 and 1984, and its motion for summary judgment regarding the dismissal of its administrative appeal challenging the BIA's appraisal. The Assistant Secretary of the Department of the Interior (the Assistant Secretary) declined to consider the Navajo Nation's administrative appeal because the notice of appeal was untimely. The district court concluded that the Assistant Secretary acted properly and denied the motion for summary judgment. On the basis of the BIA's appraisal, the district court awarded the Hopis $1,186,190.77 (the grazing rental determination).

The Navajo Nation contends that the district court and the Assistant Secretary erred in refusing to review this award because the BIA's failure to provide the Navajo Nation constitutionally adequate notice of the final grazing rental determination excused the untimeliness of its petition for review. We agree and remand to the district court for review of the award.

The Hopi Tribe cross-appeals the district court's denial of its motion for summary judgment seeking prejudgment interest on the grazing rental determination. We reverse and remand for a determination of the amount of prejudgment interest owed.

## BACKGROUND

These consolidated appeals and cross-appeals stem from a longstanding dispute over the continued presence of Navajo Indians on 900,000 acres of the Hopi Reservation in northern Arizona. More specifically, these appeals arise from the parties' disagreement over the proper valuation of Navajos' post-partition use of Hopi lands for grazing and homesites and the extent of the Navajo Nation's sovereign immunity from prejudgment interest on the grazing rental determination.

On December 16, 1882, President Chester A. Arthur signed an executive order withdrawing from the public domain 3,900 square miles in northeastern Arizona to be set aside " 'for the use and occupancy of the Moqui [Hopis], and such other Indians as the Secretary of the Interior may see fit to settle thereon.' " *Healing*, 210 F.Supp. at 129. Long after the creation of the 1882 Executive Order Reservation, the respective entitlements of the Navajo and Hopi tribes in these and surrounding lands remained disputed. In 1962, a special district court panel ruled that the Navajo Nation and the Hopi Tribe had undivided and equal interests in, and should jointly use, a portion of the 1882 Executive Order Reservation that included the 900,000 acres of Hopi land at issue in this appeal (the Joint Use Area). *Id.* at 191–92.

When this compromise proved unworkable, Congress divided the Joint Use Area into the Navajo Partitioned Lands (NPL) and the Hopi Partitioned Lands (HPL) pursuant to the Settlement Act. The boundary between the NPL and the HPL did not correspond precisely with the patchwork pattern of Hopi and Navajo settlement of the Joint Use Area. Moreover, the Settlement Act permitted the gradual relocation of Hopis and Navajos, still ongoing, to their respective lands. Pending completion of this process, where one tribe's members continue to use or occupy a portion of the other tribe's lands, the Settlement Act mandates that the occupying tribe compensate the other for the "fair rental value" of such use or occupancy. At issue in these appeals is the requirements under section 640(d)–15(a) of the Settlement Act that:

> The Navajo Tribe shall pay to the Hopi Tribe the fair rental value as determined by the Secretary for all use by Navajo individuals of any lands partitioned to the Hopi Tribe pursuant to [this Act] subsequent to the date of partition thereof.

25 U.S.C. § 640d–15(a).

In the late 1970s and early 1980s, the Project Officer of the Joint Use Area Admin-

istrative Office in Phoenix, Arizona (the Project Officer), undertook to develop a methodology for calculating the amount owed to the Hopi Tribe under section 640d–15(a) for the grazing of Navajo herds in the HPL. The lack of sales data for these rangelands and the absence of closely comparable off-reservation real estate complicated this task. The Deputy Assistant Secretary for Indian Affairs (Deputy Assistant Secretary) contracted for an appraisal taking into account the market value both of Navajo livestock grazed on the HPL and the native grasses they consumed there. In doing so, the Deputy Assistant Secretary rejected the Navajo Nation's proposed methodology based on rent charged by other federal agencies for federal lands.

On March 31, 1983, the Navajo Nation moved for reconsideration of the Deputy Assistant Director's "final decision" on behalf of the Department of the Interior in this matter. Factoring in new data while retaining the livestock-based methodology objected to, the Phoenix Area Director of the BIA recalculated the grazing rental determination. The Area Director then notified the Navajo Nation of the revised determination in a letter addressed to the Navajo chairman. The chairman of the Hopi Tribe was notified by delivery of a copy of the letter to the Navajo chairman.

The tribes requested further consultations. Between October 1984 and February 1985, the Area Director met with tribal representatives to discuss the final grazing rental determination. In January 1985, an updated appraisal led the Area Director to lower the preliminary grazing rental determination to $1,328,025.77.[1] The Area Director notified the Hopi Tribe of this revised valuation in a letter addressed to the Hopi chairman dated February 15, 1985.

The Area Director mailed a copy of this letter, in an envelope addressed to the Navajo chairman, by regular mail to the Navajo Nation. Navajo officials promptly received and logged the letter, but then misrouted it to an internal department unaware of its import and the timetable for administrative appeal that might be set in motion thereby.

The Navajo Nation acknowledges that on February 19, 1985, it received a copy of the February 15 letter to the Hopi chairman. The Navajo Nation also concedes that the Area Director did not receive the Navajo Nation's notice of appeal, dated April 29, 1985, until May 2, 1985, 72 days after the Navajo's receipt of notice of the final determination and more than one month after the expiration of the 30–day period for appeal under the 1985 version of 25 C.F.R. § 2.10(a), the version of the BIA regulation governing administrative appeals which is applicable here.

The Hopi Tribe moved to dismiss the Navajo Nation's appeal for untimeliness. In a letter dated February 24, 1987, the Assistant Secretary granted this motion. The Navajo Nation challenges the district court's refusal to overturn the Assistant Secretary's action on the ground that the notice of the final grazing rental determination given to the Navajo Nation was constitutionally insufficient.

Following the issuance of the BIA's final grazing rental determination in February 1985, the Deputy Assistant Secretary turned her attention to the previously deferred matter of calculating farmland and homesite rental values. On November 26, 1985, the Deputy Assistant Secretary issued a ruling rejecting the Project Officer's 1980 homesite and farmland valuations for lack of supporting data. The Deputy Assistant Secretary then directed the BIA's central Office to gather new data and issue a revised appraisal.

On November 22, 1986, the report of BIA Appraiser Arvel Hale (the Hale Report) was released. The Hale Report was based on data culled from aerial photographs, on-site inspections, study of topographic maps, and monitoring of relocation by Navajos from the HPL. Adopting a "capitalization of market" approach, the Hale Report calculated homesite rental values by comparing Navajo-occupied portions of the HPL to real estate sold in arms-length transactions in adjacent counties. Hale asserted that a "conscienceous

---

1. On July 2, 1988, this figure was again reduced to $1,186,190.77 to accord with the tribes' agree- ment that the calculation had been based on a premature date of partition.

[sic] effort was made to find tracts that had the same limitation as those on the HPL; *i.e.*, no domestic water systems, highway frontage or electrical power." After identifying 129 sales of tracts deemed comparable to Navajo homesites in the HPL, Hale categorized the sold properties and the homesite tracts according to size, climate, elevation and vegetation. Because the Hale Report found little correlation between sale price and proximity to water and paved roads, its calculations did not take these factors into account. Finally, HPL tracts were assigned an annual rental value of 10% of market value, after adjustment for differences in size and date of sale influencing the market value of off-reservation properties in the same category.

The Navajo Nation brought an appeal before the Interior Board of Indian Appeals (IBIA) challenging the Deputy Assistant Secretary's adoption of the homesite and farmland rental valuations set forth in the Hale Report. This challenge was based on the same objections raised by the Navajo Nation in this appeal as to double billing for grazing and homesite uses, miscalculation of abandoned sites, assumptions about minimum homesite size, reliance on misleading comparables and misidentification of the use to which Navajos were dedicating certain parcels. Pursuant to its privately commissioned critique of the BIA's appraisal (the Centerfire Report), the Navajo Nation proposed an alternative valuation of the fair rental value of the HPL used by Navajos for agricultural and homesite purposes.

On November 26, 1985, the IBIA affirmed the Deputy Assistant Secretary's determination, subject to the BIA's correction of minor misidentifications of use. The IBIA noted the extensive documentation in support of the BIA's appraisal and deemed reasonable the operating assumptions in the Hale Report to which the Navajo Nation had objected. However, the IBIA remanded the homesite rental determination for review of the Navajo Nation's claimed factual errors and correction of verified errors.

On remand, the Acting Area Director of the BIA's Phoenix office considered two rounds of extensive comments and alleged errors raised by the Navajo Nation, as well as the response of the Hopi Tribe, before preparing the final homesite rental determination. The Navajo Nation bolstered its challenge with a list of homesites it alleged were abandoned or dedicated to other uses and thus improperly factored into the homesite rental determination. The Area Director rejected the Navajo Nation's reiterated objections but ordered that revisions be made to correct and update the appraisal, including the deletion of 95 homesites from the BIA's rental rolls. On March 18, 1988, the Assistant Secretary approved and adopted this corrected homesite rental determination.

On May 8, 1987, the Navajo Nation filed suit in the District of Columbia to challenge the Assistant Secretary's dismissal of its appeal of the Acting Director's grazing rental determination. The case was transferred to the District of Arizona and consolidated with the Hopi Tribe's action there in connection with the entire range of the Navajo Nation's post-partition use and occupancy of the HPL. The Hopi Tribe had initiated this action in 1985 to compel the Secretary to issue the rental determinations promptly and accurately.

The Navajo Nation filed a motion for summary judgment challenging the Assistant Secretary's dismissal of the Navajo Nation's administrative appeal for untimeliness. The Navajo Nation contended that the Assistant Secretary violated the tribe's due process right to adequate notice and his trust responsibilities to the Navajo Nation.

On July 2, 1992, the district court issued two orders addressing the grazing rental determination and the homesite/farmland rental determinations respectively. In one order, the district court granted the United States' motion to dismiss the Navajo Nation's challenge to the Secretary's dismissal of its administrative appeal of the grazing rental determination. The district court concluded that due process "does not require notice by personal service upon the Navajo Chairman," and found no trust responsibility mandating liberal interpretation of Department of the Interior regulations in favor of the Navajo Nation. Finding no genuine issues of mate-

rial fact regarding the notice claim, the district court denied the Navajo Nation's motion for summary judgment. In addition, the district court granted the Hopi Tribe's motion for summary judgment affirming and enforcing the grazing rental determination in the amount of $1,186,190.77, minus the Navajo Nation's previous partial payment of $459,-841.84.

In the same order, the district court also rejected the Hopi Tribe's motion for partial summary judgment as to the Navajo Nation's liability for prejudgment interest. The Hopi Tribe argued that payment of such interest was necessary to satisfy Congress' intent that the Navajo Nation pay the Hopi Tribe the "fair rental value" of Navajo homesites in the HPL under section 640d–15(a) of the Settlement Act. The district court found that prejudgment interest was not mandated by statute or equity and could not be assessed against the Navajo Nation absent an unequivocal waiver of its sovereign interest immunity.

In the other order, the district court granted the Hopi Tribe's motion for judgment upon and enforcement of the homesite rental determination. The district court rejected the Navajo Nation's various challenges to the validity of the assumptions and accuracy of the data underlying the homesite rental determination. Accordingly, the district court ruled that the IBIA and the Secretary did not abuse their discretion or act arbitrarily or capriciously in upholding the BIA's homesite rental determination.

## DISCUSSION

### I. The Homesite Rental Determination

A. *Introduction*

The Navajo Nation's first contention of error is that the BIA abused its discretion by overlooking significant facts and making unsupported assumptions in its calculation of the homesite rental award, and that, accordingly, the district court erred in refusing to set aside the determination as arbitrary and capricious. We disagree. The record supports the district court's conclusion that the BIA, the IBIA and the Assistant Secretary considered all relevant facts, committed no

clear error of judgment and established a rational connection between the facts found and the amount of the award.

■■■ Unless Congress specifies otherwise, we review agency action under the Administrative Procedure Act (the APA), 5 U.S.C. § 706(2)(A) (1982). *Tribal Village of Akutan v. Hodel,* 859 F.2d 651, 659 (9th Cir.1988). Under section 706(2)(A) of the APA, agency action shall withstand judicial review unless it is " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " *Id.* (citation omitted). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Agency action passes muster under this standard of review, provided that the agency "examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.' " *Id.,* quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). We review de novo a district court's application of this standard. *Hodel,* 859 F.2d at 659.

### B. *Selection of Comparables*

■■ In its first challenge to the homesite rental determination, the Navajo Nation asserts that the "BIA did not select similar properties" and thus factored inapposite data into its capitalization of market calculations. The Navajo Nation points to various off-reservation parcels entering into the BIA's appraisal whose proximity to small towns, tourism, paved roads, utilities and other amenities allegedly made them incomparable to tracts occupied by Navajos in the HPL. The Navajo Nation asserts that these differences caused the homesite rental determination to overstate the rental value of the Navajos' more remote, barren and undeveloped homesites.

To substantiate this contention, the Navajo Nation contrasted the BIA's findings with those in its privately commissioned report.

The Centerfire Report divided the Navajo homesites into three categories on the basis of proximity to water and services. After matching the Navajo homesites by category with the privately sold off-reservation tracts, the Centerfire Report concluded that only 24 of the sales factored into the BIA appraisal involved parcels were comparable to those in the HPL.

The district court nevertheless found that "the BIA did choose comparables that were similar to the HPL tracts." Accordingly, the district court found that "the IBIA's decision that it was reasonable for the BIA not to adjust values for distance to amenities was not arbitrary and capricious and had a rational connection to the facts presented." Noting that the "ultimate standard of review is a narrow one," the district court determined after close analysis of the BIA's selection of comparables that "the Navajo Nation has presented an alternative appraisal, but has not demonstrated in any meaningful way that the BIA appraisal was incorrect."

The record supports these conclusions. Before the Navajo Nation's appeal reached the district court or even the IBIA, the BIA repeatedly reviewed and refined the homesite rental determination in response to the Navajo Nation's allegations of factual errors. The record demonstrates that the IBIA properly heard, considered and acted upon the Navajo Nation's objections and proposed alternative to the BIA appraisal before concluding that "appellant has not established that BIA's appraisals are unreasonable."

▮ While the Hale Report and the Crossfire Report disagreed in their assessment of highway frontage and proximity to water as real estate pricing variables, such disagreement between specialists does not afford a basis for reversal of agency action. Our task on appeal is not to reweigh the relative cogency of conflicting expert views, but to determine whether the agency acted within its discretion. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) ("[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive"). The record demonstrates that the BIA did not overlook the impact of proximity to roads and water on a parcel's market value. Rather, in a manner less susceptible to second-guessing upon judicial review, *see State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866, the BIA attributed less weight to these geographical factors than the Navajo Nation advocated.

In addition, the Hale Report downplayed proximity to such services only after extensive statistical analysis—analysis the IBIA and the district court determined the Navajo Nation did not refute with statistical evidence of its own. Nor did the Navajo Nation rebut the Hopi Tribe's criticism, cited by the district court, that the Centerfire Report's appraisal rested on inapposite theories of urban property valuation. Accordingly, we conclude that the BIA's decision not to attach greater weight to these factors was the product of studied inquiry articulating "a rational connection between the facts found and the choice made." *Hodel,* 859 F.2d at 656.

## C. *Inclusion of Corrals in Homesite Acreage*

▮ The Navajo Nation next contends that the BIA overstated homesite rental values on account of four types of factual errors, including "misidentifying corrals or other structures on grazing land as homesites." This error allegedly caused the BIA to overestimate the acreage of the HPL occupied by Navajo homesites by 129 acres. In addition, the Navajo Nation asserts that it was impermissibly double-billed for both the grazing and homesite rental value of certain remote corrals.[2]

The district court concluded that "the IBIA was not arbitrary and capricious in

---

**2.** To illustrate the "gross inequity" it has allegedly been dealt, the Navajo Nation notes that a recent on-site inspection reveals that one corral at site 077 NW 014 continues to be misidentified as a one-acre homesight. Consideration of this contention on appeal would be premature insofar as the district court has remanded this issue to the BIA for further consideration as to the appropriate designation of this site.

affirming the BIA's inclusion of corrals and grazing structures in the homesite rental determination." The district court pointed out that the BIA did not double-bill the Navajo Nation for homesite and agricultural uses of certain corrals, insofar as the grazing rental determination was based on the value of forage consumed and livestock raised rather than acreage occupied by grazing-related structures, such as corrals.

The district court also noted in support of the BIA's inclusion of corrals in the measurement of homesite acreage the BIA Relocation Commission's policy of interpreting "homesite" to include adjoining corrals when purchasing homesites from relocated Navajos under 25 U.S.C. § 640d–14(a). Finally, the district court concluded that inclusion in the homesite rental determination of corrals and other Navajo structures fairly charges the Navajo Nation for areas occupied by Navajo homesites from which Hopi settlers are constructively barred.

The district court's ruling on this matter was sound and, far from attributing its own reasoning to the agency officials below, solidly grounded in the administrative record. In a letter dated December 23, 1987, the Acting Area Director considered factual errors the Navajo Nation claimed had undermined the BIA's appraisal and the IBIA's decision upholding that appraisal, in *Navajo Nation v. Acting Deputy Assistant Secretary—Indian Affairs (Operations)*, IBIA 86–24–A (May 15, 1987). In this letter, the Acting Area Director explained that the BIA considered corrals to be "part and parcel of the homesites of Navajos who are awaiting relocation," in part because "the Hopi Tribe and its members are precluded from using any of the areas occupied by these corrals and other structures."

The Acting Area Director further explained that the corrals should be considered part of the homesite because the absence of forage for livestock grazing in these heavily trampled areas precluded their inclusion in the lower rent category designated "grazing areas". Finally, the Acting Area Director observed that, pursuant to the relocation compensation program administered by the BIA under 25 U.S.C. 640d–14(a), the BIA had interpreted corrals to constitute part of the "habitation and other improvements owned by [the relocated inhabitant] on the area from which he is required to move." The Acting Area Director reasonably concluded that this interpretation of section 640d–14(a) was consistent with the requirement that the Navajo Nation compensate the Hopi Tribe for such structures as homesites under section 640d–15(a).

In addition, as further explained in the Acting Area Director's letter, the IBIA took into account the Navajo Nation's objection to inclusion of corrals and double-billing for grazing and homesite use around such structures in its determination. The IBIA properly concluded that further action on this matter was not required in view of the BIA's "extensive" documentation in support of the homesite rental determination and the BIA's express willingness to correct errors when found, a willingness the record reveals to have been more than an abstract promise.

This degree of consideration, examination, review and revision does not amount to failure "to consider an import aspect of the problem" or evidence an implausibility going beyond "a difference of view". *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866–67. Accordingly, the record supports the district court's determination that the Secretary and the IBIA did not abuse their discretion in accepting the BIA's inclusion of corrals in the homesite appraisal.

### D. *Inclusion of Acreage Between Homesites and Fixtures*

■ We also reject the Navajo Nation's related contention that the BIA should not have included in its calculation of homesite acreage land situated between the homesites and adjoining grazing structures, including windmills, pipelines and water stock tanks. This error allegedly resulted in the improper designation of 856.2 acres of grazing land as homesite acreage.

Once again, the record undermines the Navajo Nation's contention that it was the victim of administrative arbitrariness and caprice. In a letter dated May 15, 1987, the Acting Area Director informed the Navajo

Nation that the homesite rental determination was based in part on the principle of exclusion, that is, the assignment to the homesite of adjoining lands encompassed by fixtures in which potential Hopi resettlers could not be expected to settle. This principle was reviewed and consistently approved and adopted throughout the Navajo Nation's series of appeals on the reasonable ground that the history of uncordial relations between the tribes made Hopi settlement amidst Navajo fixtures unrealistic.

The record further demonstrates that the application of the principle was as sound and careful as its underlying assumptions were reasonable. Pursuant to the IBIA's mandate, the BIA diligently corrected and refined calculations based on the exclusion principle to remove factual errors insofar as reasonably possible in an appraisal of such magnitude. We discern no abuse of discretion therein.

E. *The One–Acre Assumption for Homesites*

■ The Navajo Nation also contended that the BIA overstated by 148 acres the total acreage of Navajo homesites in the HPL by incorrectly assuming that each homesite occupied at least one acre. This assumption, the Navajo Nation alleges, arbitrarily and capriciously ran afoul of a requirement in section 640d–15(a) of the Settlement Act that the Navajo Nation be charged only for actual use. We disagree.

In rejecting this contention, the district court noted that the one-acre assumption reflected the BIA's examination of actual use of areas adjoining Navajo dwellings. As noted by the district court, the Acting Area Director explained that the BIA had considered as evidence of use the existence of a variety of appurtenant structures, including "hogans, outhouses, sunshades, sweat houses, clothes lines, mechanic tripods, corrals, fuel storage tanks, old car bodies, and sheds." In light of this examination, the Area Director ·concluded that "[i]n no case were we able to determine that protection of the rights and property of Navajos awaiting relocation could be accommodated with a compound of less than one acre."

Further, the IBIA rejected as "unrealistic" the Centerfire Report's estimate that the typical Navajo homesite was one-tenth of an acre "given the lifestyle of the residents." This disagreement plainly concerned a "product of agency expertise" and may fairly be "ascribed to a difference in view" between the agency and the aggrieved party. *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867. The IBIA acted within its administrative discretion in attaching greater weight to the considered and repeatedly reviewed findings of the BIA's own experts.

F. *Assessment of Rent For Abandoned Homesites*

■ The Navajo Nation's final contention of error with regard to the homesite rental determination is that the BIA charged it rent for abandoned· homesites. The Navajo Nation raised this same contention in its administrative appeals and sought to bolster it with a list of homesites it alleged were abandoned and improperly included within the homesite rental determination. The district court dismissed this contention after noting that the final determination was consistent with the BIA's more current homesite rolls, and that the Navajo Nation had not updated its conflicting list of homesites to reflect changes occurring since its appeal before the IBIA.

As the district court noted, the Area Director explained that the BIA did not remove from its list all homesites alleged by the Navajos to have been abandoned. The Acting Area Director justified this refusal on the basis that on-site inspections revealed that allegedly vacant buildings were locked or had been converted into storage facilities, and thus were still in use by Navajos and unavailable to Hopis.

In addition, the Acting Area Director noted that some homesites deemed abandoned in the Centerfire Report may have been among a number of homesites occupied by a single remaining Navajo family. In view of the staleness of the Navajo Nation's list of abandoned homesites, the BIA's performance of numerous on-site inspections and the BIA's adoption of reasonable factual assumptions pertaining to abandonment, we find

that the Secretary's abandonment determination neither "runs counter to the evidence before the agency, [n]or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867.

## G. Conclusion

In short, the record supports the district court's conclusion that the BIA articulated a rational connection between its findings of fact and the final homesite rental determination. Accordingly, we agree with the district court that this determination, and the decision of the IBIA and the Secretary upholding the homesite rental determination subject to minor corrections, was not arbitrary or capricious and did not constitute an abuse of discretion under section 706(A) of the APA.

## II. The Grazing Rental Determination

The Navajo Nation next challenges on a due process ground the district court's ruling that the Assistant Secretary appropriately dismissed the Navajo Nation's appeal of the grazing rental determination for untimeliness. The Navajo Nation contends that delivery on February 19, 1985, of a copy of the Area Director's letter to the Hopi Tribe dated February 15, 1985, in an envelope addressed to the Navajo chairman, was constitutionally inadequate and breached the promise of a BIA staff attorney to send notice directly to the Navajo Nation's deputy attorney general, the tribal official assigned to the grazing rental issue.

The Navajo Nation further asserts that sufficient notice was not served prior to its tribal counsel's receipt of a letter dated April 3, 1985 from the BIA regarding the final grazing rental determination. This letter was sent pursuant to a telephone call on March 25, 1985 from Louis Denetsosie, then deputy attorney general of the Navajo Nation, to Daniel Jackson, an attorney in the Field Solicitor's Office of the Department of the Interior, reminding Mr. Jackson of the Department of the Interior's promise to send notice directly to Mr. Denetsosie's office. The Navajo Nation contends that it filed a

timely notice of administrative appeal within 30 days of receiving this notice under 25 C.F.R. § 2.10(b). We agree.

 Whether notice satisfies due process is a question of law reviewed de novo. *In re Cement and Concrete Antitrust Litigation,* 817 F.2d 1435, 1440 (9th Cir.1987). We also review de novo a district court's interpretation of a federal regulation. *United States v. Semenza,* 835 F.2d 223, 224 (9th Cir.1987).

The district court concluded that the Navajo Nation was alone responsible for its failure to file a timely appeal "because the notice was internally misrouted to the wrong Navajo agency," the Navajo–Hopi Development Office. The district court deemed the photocopied letter dated February 15, 1985, to comply with the here applicable version of the regulation governing formal notice requirements, 25 C.F.R. § 2.4 (1985). The 1985 version of section 2.4 provided that:

> Notice shall be given of any action taken or decision made from which an appeal may be taken under the regulations in this part, to any Indian or Indian tribe whose legal rights or privileges are affected thereby. This notice shall be in writing and shall be given by the official making the decision or taking the action. Failure to give such notice shall not affect the validity of the action or decision, but the right of appeal therefrom shall continue under the regulations in this part for the periods hereinafter set forth.

25 C.F.R. § 2.4 (1985).[3]

The district court also deemed the photocopied letter of February 15 to comport with the requirements of due process. It held that delivery by regular mail to the Office of the Navajo Chairman of the photocopied letter to the Hopi Tribe "was reasonably calculated to inform the Navajo Nation and the Navajo Tribal Chairman of the determination."

The district court then ruled that the Navajo Nation, in neglecting to file a timely notice of appeal after receiving adequate no-

---

**3.** In 1989, the regulations were amended to require that the notice include a statement of the 30-day limit for filing an appeal. 25 C.F.R. § 2.7.

tice, failed to exhaust administrative remedies under 25 C.F.R. § 2.3(b). In doing so, the Navajo Nation failed to meet a prerequisite for judicial review of final agency action under section 704 of the APA, the district court held. Section 2.3(b) provides that an administrative decision shall only be considered final and subject to judicial review when no administrative avenue of appeal remains open or the officer appealed to rules that the decision is immediately effective. 25 C.F.R. § 2.3(b). The district court concluded that the grazing rental determination was final but nevertheless not appealable under section 2.3(b) in the absence of a timely notice of appeal. *See* 25 C.F.R. § 2.10(b) (1985) ("[n]otices of appeal which are not timely filed will not be considered, and the case will be closed.").

The applicable regulations specify that the notice shall be "in writing", but are otherwise silent as to the required content of a notice of an agency decision or action. 25 C.F.R. § 2.4 (1985). In the absence of a more specific and exacting notice requirement in the regulations, we direct our inquiry to whether the Area Director's February 15 letter reached the minimum threshold for notice under the Due Process Clause of the Fifth Amendment. *See Whetstone v. INS*, 561 F.2d 1303, 1306, n. 3 (9th Cir.1977), *citing Jarecha v. INS*, 417 F.2d 220, 225 (5th Cir. 1969). Under the Court's classic formulation of the due process standard in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties" of the ruling or action. More specifically, "[t]he means employed must be such as one desirous of actually informing the [party to be noticed] might reasonably adopt to accomplish it." *Id.* at 315, 70 S.Ct. at 657.

The photocopied letter of February 15 fell short of the mark both in design and implementation. "At what point the party to be affected by the notice should have been put upon inquiry as to the contents of the notice is an ordinary question of fact, fully dependent upon the then surrounding circumstances." *NLRB v. Vapor Recovery Systems Co.*, 311 F.2d 782, 786 (9th Cir.1962). Given the size and bureaucratic complexity of the Navajo Nation and the narrowness of the timetable for appeal under 25 C.F.R. § 2.10, the Navajo Nation's untimely reaction to the purported notice was the foreseeable result of shortcomings in the February 15 letter and the BIA's departure from both agreed and, as discussed below, prior procedure. In light of the letter's salutation to a third party, the Hopi Tribe, and the absence of potentially off-setting safeguards beyond those which delivery by regular mail affords, here, as in *Mullane*, it cannot be said that the "chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected." 339 U.S. at 315, 70 S.Ct. at 657. Rather, as in *Mullane*, the party to be noticed was unable, for reasons attributable to and foreseeable by the notifying agency, to act upon the purported notice promptly because the letter was not "of such nature as reasonably to convey the required information ... [and] afford a reasonable time for those interested to make their appearance" or objection. *Id.* at 314, 70 S.Ct. at 657.

The photocopied letter of February 15 raised the unfortunate prospect that the recipient would misapprehend the letter's import, mistakenly assume the letter was misaddressed or otherwise fail to be meaningfully informed by it in a timely manner. This prospect became an unreasonably high probability in light of assurances evidently given by a Department of the Interior official, but ignored until the telephone call from the Navajo deputy attorney general, that the BIA would deliver notice of the final grazing rental determination directly to the Navajo Nation's tribal counsel. This promise accorded with the more robust measures adopted by the BIA to notify the Navajo Nation of a preliminary grazing rental determination in October 1984, including hand-delivery to the Navajo Nation of the notice and simultaneous consultations with BIA officials. Given the BIA's status as a trustee "subject to the United States' fiduciary responsibilities toward Indian tribes," *Covelo Indian Community v. FERC*, 895 F.2d 581,

586 (9th Cir.1990), the Area Director's fulfilment of this promise could reasonably be expected and relied on to a greater extent than would be the case in a run-of-the-mill administrative proceeding involving a more arms-length relationship between the agency and the promisee. In this light, the BIA should have foreseen that these assurances would induce a justifiable but false sense of security in Navajo officials.

In support of the district court's ruling, the Hopi Tribe contends that even if the February 15 letter was insufficient notice, the Navajo Nation received—and neglected to respond in a timely manner to—actual notice of the grazing rental determination soon thereafter. Indeed, the record indicates that the Navajo Nation received actual notice of the final grazing rental determination on March 25, 1985, the date of the telephone conversation in which an attorney for the Department of the Interior apprised Navajo counsel of the final rental determination. This actual notice, the Hopi Tribe asserts, started the 30–day clock for administrative appeals under 25 C.F.R. § 2.10(a),[4] which then expired prior to the Area Director's receipt of the Navajo Nation's notice of appeal on May 2, 1985.

To buttress this alternative argument, the Hopi Tribe cites our decision in *Vapor Recovery* for the proposition that "[w]here the giving of written notice is required.... it is sufficient to show that the party to be notified received *actual written notice*, the means being employed being unimportant." 311 F.2d at 785 (emphasis added).[5] However, *Vapor Recovery* does not support this argument or the district court's ruling be-

cause here the party to be notified, the Navajo Nation, did not fail to file a timely notice of appeal after receiving actual written notice of the agency decision. While it is clear and largely undisputed that the March 25 telephone call constituted actual notice, in specifying notice "in writing", section 2.10(a) required more. In that conversation, Navajo counsel requested formal notice. The request was immediately agreed to but, crucially for purposes of the 30–day timetable for appeal in section 2.10(a), was only fulfilled upon the arrival of the written notice requested several days later.

We conclude that the BIA first afforded the Navajo Nation written notice complying with the requirements of both due process and applicable regulations by means of the Area Director's letter, dated April 3, 1985, in response to the Navajo deputy attorney general's request for formal notice. In accordance with 25 C.F.R. § 2.10(a) (1985), the Navajo Nation filed its notice of appeal, dated April 29, 1985, and received by the Area Director on May 2, 1985, within 30 days of receiving notice of the final grazing rental determination from the Area Director. Illustratively, the address on the envelope and the salutation on the letterhead of the letter of April 3, 1985, were reasonably designed to guide the notice of the final grazing determination to its intended and appropriate destination, the Navajo Nation's tribal council. In contrast with the ill-directed letter of February 15, this notice clearly and promptly achieved its intended purpose.

Viewing "all the circumstances" as required under *Mullane, id.*, and *Vapor Recov-*

---

4. This regulation provides in relevant part that:

> (a) A notice of appeal shall be in writing and filed in the office of the official who made the decision that the appellant wishes to appeal ... The notice of appeal must be received in the office of the official who made the decision within 30 days after the date notice of the decision complained of is received by the appellant, together with all supporting documents....
> (b) No extension of time will be granted for filing of the notice of appeal. Notices of appeal which are not timely filed will not be considered, and the case will be closed.

25 C.F.R. § 2.10 (1985).

5. Nor does *Vapor Recovery* support the Hopi Tribe's argument that the February 15 letter gave sufficient notice notwithstanding the Navajo Nation's failure to route the letter promptly to concerned officials. To be sure, in *Vapor Recovery* we noted that the cooperation of the party noticed in opening and reading the notice "is an element beyond the control of the party giving the notice and should not be a factor in judging the adequacy of this performance." 311 F.2d at 786. But the instant case does not involve failure of this sort, either through intransigence or neglect. Navajo officials expeditiously opened and read the notice but, as in *Vapor Recovery*, the method chosen did not "succeed in imparting knowledge of its contents." *Id.*

*ery,* 311 F.2d at 786, we hold that the photocopied letter dated February 15, 1985 did not constitute legally sufficient notice to the Navajo Nation of agency action under the Due Process Clause of the Fifth Amendment.[6] The Navajo Nation filed a timely notice of appeal of the grazing rental determination within 30 days of receiving notice thereof under 25 C.F.R. § 2.10(a). Accordingly, the district court erred in ruling that it lacked jurisdiction to review the grazing rental determination under section 704 of the APA.

### III. Prejudgment Interest

In its cross-appeal the Hopi Tribe contends that the district court erred in refusing to award it prejudgment interest on the grazing rental determination. We agree.

■ The decision to grant prejudgment interest ordinarily "rests within the discretion of the district court." *U.S. Dominator Inc. v. Factory Ship Robert E. Resoff,* 768 F.2d 1099, 1106 (9th Cir.1985) (citation omitted). However, whether Congress statutorily waived an Indian tribe's sovereign immunity is a question of statutory interpretation. We review a district court's interpretation of a statute de novo. *Rosenfeld v. United States,* 859 F.2d 717, 725–26 (9th Cir.1988).

■ Where, as here, an issue arises as to whether Congress has exercised its plenary power to waive the sovereign immunity of an Indian tribe, "[i]t is settled that a waiver 'cannot be implied but must be unequivocally expressed.'" *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978) (citation omitted); *see also, Evans v. McKay,* 869 F.2d 1341 (9th Cir.1989).[7] The district court found that the

Settlement Act does not mention prejudgment interest expressly, either in section 640d–15(a), mandating payment of rent, section 640d–17(c), authorizing additional actions to insure quiet enjoyment of reservation lands, or section 640d–17(e), authorizing recovery of all remedies provided for in the Federal Rules of Civil Procedure or otherwise available in federal district courts. Accordingly, the district court ruled that Congress' failure expressly to waive the Navajo Nation's immunity from prejudgment interest precluded a grant of such relief.

In examining the text and purpose of the Settlement Act, we bear in mind the Court's admonition against "crabbed construction" of statutes waiving sovereign immunity in *Franchise Tax Bd. of Cal. v. U.S. Postal Service,* 467 U.S. 512, 521, 104 S.Ct. 2549, 2554, 81 L.Ed.2d 446 (1984). In that case the Court liberally interpreted the "sue-and-be-sued" provision in 39 U.S.C. § 401(1) to require the U.S. Postal Service to accede to the order of California tax authorities to withhold the wages of postal employees who were delinquent in paying state income taxes. *Id.* at 524–25, 104 S.Ct. at 2556. The Court instructed that "waiver of sovereign immunity is accomplished not by a 'ritualistic formula'; rather intent to waive immunity and the scope of such a waiver can only be ascertained by reference to underlying congressional policy." *Id.* at 521, 104 S.Ct. at 2554, *citing Keifer & Keifer v. Reconstruction Finance Corp.,* 306 U.S. 381, 389, 59 S.Ct. 516, 517–18, 83 L.Ed. 784 (1939).

The district court's reading of the Settlement Act falls afoul of this interpretive guidance. Examining the Settlement Act de novo and in light of *Franchise Tax Bd.,* we

---

**6.** Having found the notice to fall short of due process and regulatory requirements, we need not consider the Navajo Nation's alternative argument that by giving the Hopi Tribe more ample notice of the final grazing rental determination, the Secretary violated his fiduciary duty to the Navajo Nation, pursuant to the United States' trust responsibility to Indian tribes, to treat the tribes equally.

**7.** The Hopi Tribe contends that under *Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989),. "strict construals of waivers of sovereign immunity as to interest apply only to waivers of the United States' own immunity,"

insofar as only the United States has historically benefitted from a "no-interest rule" and its corollary "ultrastrict canon of construction." *See id.* at 281, n. 3, 109 S.Ct. at 2468, n. 3. We read the Settlement Act to include a waiver of any tribal interest immunity in terms sufficiently unequivocal to pass muster even under the strict interpretive standard set forth in *Santa Clara Pueblo* and *McKay.* Accordingly, we need not consider whether a less stringent canon of construction applies here or determine whether Indian tribes enjoy sovereign interest immunity equivalent to that of the United States.

conclude that Congress unequivocally waived any tribal immunity from prejudgment interest by authorizing the two tribes to pursue all remedies available in federal district court in actions to enforce or collect judgments obtained pursuant to the Settlement Act. *See* 25 U.S.C. § 640d–17(e). The district court's contrary interpretation of the Settlement Act disregards the clear import of Congress' broad authorization of remedies in section 640d–17(e) and contravenes the overriding congressional purpose behind the Settlement Act, full compensation to the Hopi Tribe for the fair rental value of Navajo-occupied lands. *See* 25 U.S.C. § 640d–15(a).

Section 640d–17(e), entitled "Remedies", provides that:

> [a]ll applicable provisional and final remedies provided for by the Federal Rules of Civil Procedure and all other remedies and processes available for the enforcement and collection of judgments in the district courts of the United States may be used in the enforcement and collection of judgments obtained pursuant to the provisions of this subchapter.

25 U.S.C. § 640d–17(e). This blanket authorization of "all remedies available" in federal district courts necessitates some inquiry into what damages and costs are currently recoverable there. But in requiring this wide-ranging inquiry, the statutory language does not *ipso facto* render the congressional waiver of tribal interest immunity therein equivocal. Rather than compile an exhaustive list of currently available remedies and add a clause authorizing additional remedies upon their introduction in federal court, section 640d–17(e) reasonably relies on a more general formulation that accomplishes the same result with equal clarity and far greater efficiency.

Further, in keeping with the criterion for authorization under section 640d–17(e), prejudgment interest is plainly a remedy currently available in federal district courts. Prejudgment interest has become a familiar remedy widely recognized by federal courts as a means to make a plaintiff whole against a dilatory defendant. *See, e.g., General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983); *Partington v. Broyhill Furniture Industries,* 999 F.2d 269, 274 (7th Cir.1993) ("[m]oney has a time value, and prejudgment interest is therefore necessary in the ordinary case to compensate a plaintiff fully for a loss suffered at time t and not compensated until t + 1 …"). Moreover, prejudgment interest is a well-established remedy in this circuit. *See, e.g., Home Savings Bank, F.S.B. v. Gillam,* 952 F.2d 1152, 1161 (9th Cir.1991); *U.S. Dominator,* 768 F.2d at 1106 ("[p]rejudgment interest is awarded so that the award will reflect the present value of plaintiff's claim"). In light of the widespread acceptance of prejudgment interest, only by an untenably "crabbed construction" of the Settlement Act could section 640d–17(e) be read to exclude prejudgment interest for failure to recite exhaustively that which is authorized lest it be forbidden. *See Reopell v. Mass.,* 936 F.2d 12, 15 (1st Cir.1991); *accord Pegues v. Miss. State Employment Service,* 899 F.2d 1449, 1454 (5th Cir.1990) ("Congress did not limit the tools with which courts could fashion relief").

In support of its denial of prejudgment interest on the grazing rental determination, the district court cited Congress' express authorization of interest in 25 U.S.C. § 640d–17(a)(1) and (a)(2), mandating an accounting between the tribes of various fees collected by them in the Joint Use Area.[8] The district court reasoned that if Congress had intended to waive tribal sovereign immunity generally in actions brought pursuant to the Settlement Act, it would have drafted the general remedy provision in section 640d–17(e) to authorize prejudgment interest in similarly express terms.

The Hopi Tribe counters that sections 640d–17(a)(1) and (a)(2) are distinguishable

---

8. Section 640d–17(a)(1) requires an accounting between the tribes of trader license fees, lease proceeds and similar charges collected by the tribes for agricultural uses of the pre-partition Joint Use Area after September 1957. Section 640d–17(a)(2) requires compensation to each tribe for the "fair value" of the other tribe's grazing and agricultural activities in the Joint Use Area after September 1962. Under both, the collecting tribe must remit to the other tribe an equal portion of such pre-partition monies, plus back interest compounded at 6% per annum.

from the authorization of post-partition rent under section 640d–15(a) and the recovery of prejudgment interest on late grazing rental payments under section 640d–17(e). It argues that "[i]n both § 640d–17(a)(1) and (a)(2), Congress mandated the awarding of interest because at the time it enacted the Settlement Act, it knew there would be an award, that the award was past due, and that the award would be a liquidated, determinable sum." In contrast, under section 640d–17(a)(3), Congress expressly provided that each tribe would be compensated "without interest" for damage done to the Joint Use Area by the other tribe, an uncertain amount less amenable to precise proof and an annual accounting.

We agree that section 640d–15(a), neither expressly requiring nor proscribing an award of interest, falls in between these statutes and is subject to the general and sufficiently unequivocal remedy provision set forth in section 640d–17(e). Indeed, in sections 640d–17(a)(1) and (a)(2), Congress retrospectively mandated apportionment of reasonably ascertainable monies already collected by one tribe and owed to the other. In contrast, section 640d–15(a) prospectively authorized recovery of post-partition rent that Congress knew would be owed in some then uncertain amount, but had no cause to suspect would be paid only after protracted settlement efforts and lengthy litigation. Accordingly, upon its passage of the Settlement Act, Congress could not know that interest would have to be added to this award to make the Hopi Tribe whole for the lost time value of future rents untimely paid by the Navajo Nation pursuant to section 640d–15(a).

The district court underestimated the latitude left to the courts to award full compensation for delays in rental payments made under section 640d–15(a). "Courts may allow prejudgment interest even though the governing statute is silent" to compensate a prevailing plaintiff for the defendant's delay in payment. *Frank Music Corp. v. Metro–Goldwyn Mayer Inc.*, 886 F.2d 1545, 1550 (9th Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990). Where, as here, the governing statute is not silent but sweeping in its authorization of

remedies encompassing prejudgment interest, our discretion to fashion such relief is at least as broad. While section 640d–15(a) does not address interest awards, section 640d–17(e) explicitly expresses Congress' intention that, in the event of litigation to enforce or collect a judgment under the Settlement Act, federal courts shall have at their disposal the full panoply of remedies and processes available therein, including prejudgment interest.

The general congressional purpose evident in section 640d–15 reinforces this conclusion. *See Franchise Tax Bd.*, 467 U.S. at 521, 104 S.Ct. at 2554 (scope of waiver of sovereign immunity is gauged "by reference to underlying congressional policy"). Following *Jenkins*, other courts have recognized that where Congress intends to afford complete compensation, prejudgment interest is necessary to promote this intent notwithstanding the dilatory defendant's sovereign interest immunity defense. *See Reopell*, 936 F.2d at 17 ("[w]hile ... Congress did not expressly provide for the inclusion of prejudgment interest in an award under the VRRA, such interest has commonly been implied by the courts as being necessary to carry out Congress' purpose to make a veteran whole"). *Pegues*, 899 F.2d at 1453 ("interest is an item that '*should be* included in back pay' to make a victim whole") (emphasis in original) (citation omitted).

We are persuaded that Congress intended to make the Hopi Tribe whole under section 640d–15(a) of the Settlement Act by entitling it to the "fair rental value" of Navajo use of the HPL. Prejudgment interest is essential to the achievement of that purpose. Accordingly, we reverse the district court's denial of prejudgment interest on the grazing rental determination and remand for a determination of the amount of such interest owed under sections 640d–15(a) and 640d–17(e).

## CONCLUSION

We affirm the judgment of the district court upholding the homesite rental determination. We reverse the district court's dismissal of the Navajo Nation's motion for review of the grazing rental determination and denial of its motion for summary judg-

ment regarding the timeliness of its notice of administrative appeal. In addition, we reverse the ruling of the district court denying the Hopi Tribe prejudgment interest on the grazing rental determination and remand for a determination of prejudgment interest owed by the Navajo Nation thereon.

**AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

The parties shall bear their own costs in this appeal.