610

ALYESKA PIPELINE SERVICE COM-
PANY; Amerada Hess Pipeline Corpo-
ration; Arco Pipeline Company; BP
Pipelines, Inc.; Exxon Pipeline Compa-
ny; Mobil Alaska Pipeline Company;
Phillips Alaska Pipeline Corporation;
Alyeska Pipeline Service Company; So-
hio Alaska Pipeline Co.; Unocal Pipe-
line Company, Plaintiffs–Appellees,

and

State of Alaska, Plaintiff–
intervenor–Appellee,

v.

KLUTI KAAH NATIVE VILLAGE OF
COPPER CENTER, Defendant,

and

Copper Center Village Council; Nicholas
Lincoln, individually and as President
of the Copper Center Village Council;
Cathy McConkey, individually and as
Copper Center Village Administrator;
Bernie Martin, individually and as Com-
missioner of the Copper Center Village
Tax Commission; Phyllis Yazzie, indi-
vidually and as Commissioner of the
Copper Center Village Tax Commission;
Lidia Selkregg, individually and as
Commissioner of the Copper Center Vil-
lage Tax Commission, Defendants–Ap-
pellants.

No. 95–36292.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7.

Filed Nov. 20, 1996.

Lawrence A. Aschenbrenner, Native American Rights Fund, Anchorage, AK, for defendants-appellants.

James R. Atwood, Covington and Burling, Washington, DC, for plaintiffs-appellees.

Elizabeth J. Barry, Assistant Attorney General, Anchorage, AK, for intervenor-plaintiff-appellee.

Bruce N. Edwards and Michael R. Sorensen, Sorensen & Edwards, P.S., Seattle, WA, for amicus curiae Shee Atika, Incorporated.

Before: BROWNING, D. W. NELSON, and FERNANDEZ, Circuit Judges.

D. W. NELSON, Circuit Judge:

Copper Center Village Council and certain officials of the Kluti Kaah Native Village of Copper Center ("Kluti Kaah") appeal the district court's determination that the Alaska Native Claims Settlement Act extinguished Indian country in Alaska, and that Kluti Kaah Native Village therefore lacks the authority to impose its Business Activity Tax upon the owners and operator of the Trans–Alaska Pipeline. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm. We conclude that the land at issue is not Indian country because it is subject to a federal right-of-way for the Trans–Alaska Pipeline.

### BACKGROUND

This case arises from the attempt by the Kluti Kaah Native Village of Copper Center to impose its Business Activities Tax upon the owners and operator of the Trans–Alaska Pipeline System, which passes through land near the village.

Kluti Kaah is a group of Alaska Natives who historically have inhabited an area near Copper Center, at the confluence of the Klutina and Copper Rivers in the Copper River Valley. A subgroup of the Ahtna, a band of Alaska Natives who have lived in the region for nearly 2,000 years, the Native Village of Kluti Kaah emerged as a distinct group from a Native community living on a federal school reserve near Copper Center at the turn of the century. The Copper Center Village Council is the governing body of the group.

In 1971, Congress passed the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1601 et seq., which revoked "the various reserves set aside" for Alaska Natives by legislative or executive action, 43 U.S.C. § 1618(a), and extinguished aboriginal title, 43 U.S.C. § 1603. In exchange, Congress authorized the transfer. of $962.5 million and approximately 44 million acres of public land to Native village and regional corporations created by the Act. 43 U.S.C. §§ 1607, 1611. The Act provided for these corporations to be owned by Native shareholders residing in the corporations' respective geographical areas. Under the Act, the corporations were entitled to select from designated public land, with the regional corporations gaining title to the subsurface estate and the surface estate of all land selected with one exception: the village corporations would gain title to the surface estate of the lands they selected within the regional corporation areas. See 43 U.S.C. §§ 1610, 1611.

Ahtna Inc. is the regional corporation that owns land in the Copper Center area. The Kluti Kaah Corporation, recognized under the Act as the village corporation with rights to land in the area, merged into Ahtna Inc. in 1980. In the merger agreement, Ahtna Inc. gained rights to the surface estate of land formerly held by the village corporation. The agreement provided, however, that Ahtna Inc.'s right to explore, develop, or remove minerals from the subsurface estate of former village corporation lands is subject to the consent of the successor organizations to the village corporations. The agreement also conferred on successor village organizations the right to withhold reasonable consent (subject to binding arbitration) to any other

type of development within the boundaries of the Native village for which the corporation was formed. The Native Village of Kluti Kaah Council is the successor organization to the Kluti Kaah Corporation.

On December 18, 1986, the Council adopted a "Business Activities Tax," a 5% tax on gross receipts from business activities occurring within a 72 square-mile area in the vicinity of Copper Center. The Council claimed to have "territorial jurisdiction" over this area. Roughly half of the area consists of land owned by Ahtna Inc., subject to the merger agreement described above. During the course of the litigation, Kluti Kaah officials modified their claim of taxing authority to extend only to the Ahtna Inc.-owned land.

Approximately seven miles of the Trans–Alaska Pipeline passes through the region. This portion of the region was originally exempted from land available for Natives to select under the Act, because Congress sought to preserve a Pipeline corridor, unencumbered by Native land claims. However, after Ahtna Inc. and the local Native corporations concluded an agreement with Alyeska, the Secretary of the Interior revoked the order exempting this land. Ahtna Inc. now owns the land, but it remains subject to a federal right-of-way for the Pipeline.

In 1987, Alyeska, the operator of the Trans–Alaska Pipeline System, along with the multiple owners of the System (hereinafter collectively referred to as "Alyeska") brought suit against the Council, Kluti Kaah Native Village, and several individual defendants. On May 13, 1987, the District Court for the District of Alaska granted Alyeska's motion to enjoin collection of the tax. The State of Alaska subsequently intervened in support of Alyeska.

During the course of the litigation, the district court found that the Kluti Kaah Native Village was a Tribe.[1] After a bench trial, however, the court concluded that despite Kluti Kaah's tribal status, the Council had no authority to impose the tax because the land in question did not qualify as Indian country. The court reasoned that ANCSA had eliminated Indian country in Alaska. This appeal followed.

## STANDARD OF REVIEW

■■■ The interpretation of a statute is a question of law reviewed de novo. *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 921 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995). Findings of fact that underlie the district court's legal conclusions are reviewed for clear error. Fed.R.Civ.P. 52(a); *United States v. American Prod. Indus., Inc.,* 58 F.3d 404, 407 (9th Cir.1995).

## DISCUSSION

■■ The authority of a Native community to tax non-members derives from the status of the land occupied by the community. *State of Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1390 (9th Cir.1988) ("*Venetie I*"); *Burlington Northern R.R. Co. v. Blackfeet Tribe,* 924 F.2d 899, 904 (9th Cir.1991), *cert. denied,* 505 U.S. 1212, 112 S.Ct. 3013, 120 L.Ed.2d 887 (1992). Accordingly, the central issue to be resolved in this case is whether the Kluti Kaah Tribe occupies Indian country. *See Venetie I,* 856 F.2d at 1390. We conclude that it does not.

Congress has recognized three types of Indian country: reservation lands, allotments, and dependent Indian communities.[2] Because the land at issue here is neither a reservation nor allotment land, we consider

1. Following that determination, defendant Kluti Kaah Native Village was dismissed from the case, and the suit proceeded against the Council and Council officials.

2. The statute defining Indian country provides:
   "Indian country," as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all *dependent Indian communities* within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
   18 U.S.C. § 1151 (1994) (emphasis added).

only whether the Kluti Kaah Tribe may lay claim to Indian country by virtue of being a dependent Indian community.

■ In the related opinion of *State of Alaska v. Native Village of Venetie Tribal Government* (*Venetie II* ), 101 F.3d 1286 (9th Cir.1996), we set forth the appropriate standard for determining whether an dependent Indian community exists. We held that while the determination entails a "factually dependent" inquiry into six factors, two fundamental conditions must be met before a tribe may be considered to be a dependent Indian community. *Id.* First, the land at issue must be "set aside for the use of the Natives as such." *Id.* Second, the Natives must be "under the superintendence of the federal government." *Id.; see also Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 511, 111 S.Ct. 905, 910, 112 L.Ed.2d 1112 (1991). We hold that the land in dispute here was not "set aside for the use of the Natives as such," and therefore is not Indian country, because it forms part of the Trans–Alaska Pipeline corridor.

■ Both the text and history of ANCSA indicate that Pipeline land cannot be construed as a federal set-aside. ANCSA provides that the Secretary of the Interior may withdraw "a utility and transportation corridor across public lands in Alaska." 43 U.S.C. § 1616(c). Under this provision of the statute, the withdrawn territory is excluded from the land-distribution plan—Native corporations are not entitled to select from this land. *Id.*

The provision implements one of Congress' fundamental goals in enacting ANCSA: allowing for the creation of a trans–Alaska oil pipeline, unencumbered by Native land claims. Felix S. Cohen, *Handbook of Federal Indian Law* 742 (1982 ed.). The "discovery of oil on the North Slope intensified . . . [the] conflict" between Natives claiming aboriginal title and those seeking to develop a Trans–Alaska Pipeline. H.R.Rep. No. 92–523, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S.C.C.A.N. 2192, 2194. This conflict provided a major impetus for the statute. *See id.; see also* Mary C. Berry, *The Alaska Pipeline: The Politics of Oil and Native Land Claims* 163–214 (1975) (describing how desire for Pipeline led to legislative settlement of Native claims); Richard W. Hughes, *Indian Law*, 18 N.M. L.Rev. 403, 423 (1988) ("ANCSA was enacted to effectuate an honorable settlement of the native claims, and to clear the way for the pipeline."); Marilyn J. Twitchell, Note, *Amoco Production Co. v. Village of Gambell: Federal Subsistence Protection Ends at Alaska's Border*, 18 Envtl. L. 635, 641 (1988) ("The . . . discovery of oil at Prudhoe Bay pushed Congress to settle Native land claims. The state and the oil industry pressured Congress to quiet title quickly to land to allow unhindered construction of the Transalaska Oil Pipeline.")

After the enactment of ANCSA, the Secretary withdrew a Pipeline corridor, which included the area in dispute. P.L.O. 5150, 36 Fed.Reg. 25410 (Dec. 31, 1971). When Congress subsequently enacted the Trans–Alaska Pipeline Authorization Act in 1973, 43 U.S.C. § 1651 et seq., the Pipeline right-of way was granted to Alyeska. The Secretary then issued a public land order authorizing construction of the Pipeline, P.L.O. 5403, 39 Fed.Reg. 1592, and a federal right-of-way grant that included the land at issue.

Ahtna Inc. ultimately did gain the right to select from this land. Under the 1974 agreement between Alyeska and the Natives, Alyeska agreed to support the revocation of P.L.O. 5150, subject to a federal Pipeline right-of-way, and to provide employment for Ahtna Natives. In exchange, Ahtna Inc. and the village corporations in the region agreed to grant additional rights-of-way if needed. The Secretary then revoked the order withdrawing the land, and Ahtna Inc. and Kluti Kaah Corp. thereby gained selection rights to the territory in dispute. However, under the terms of ANCSA, those selection rights remained subject to the pre-existing federal Pipeline right-of-way. 43 U.S.C. § 1613(g). Viewed in light of Congress's goal of enabling the construction of the Pipeline, unfettered by Native land claims, we conclude the preservation of the Pipeline right-of-way precludes a finding of a federal set-aside where Pipeline land is involved.

This case is far different from *Burlington Northern,* 924 F.2d at 903, in which the right-of-way at issue was granted *after* Congress set aside land for the Tribe in the form of a reservation. In *Burlington Northern,* the court emphasized that although Congress ratified the agreement establishing the reservation at issue in 1888, subsequent to granting a right-of-way to the railroad in 1887, "the agreement embodied in the Act of 1888 was signed by the Tribes and representatives of the United States *before* the Act of 1887 was passed." *Id.* (emphasis added). Congress therefore already had conferred a property interest on the Tribe when the railroad received the right-of-way. *Id.* Here, the right-of-way pre-dated the Natives' property interest.

Moreover, in this case, where the original land distribution under ANCSA specifically exempted land withdrawn for the Pipeline, there was clear congressional intent to confer special status on land designated for Pipeline development. Thus, although the Natives ultimately gained selection rights to the land, the right-of-way preserved that special status. In these circumstances, we cannot conclude that the land in question was "set aside for the use" of the Natives "as such." Accordingly, we find that the territory at issue in this case is not Indian country, and that Kluti Kaah does not have the power to impose its Business Activities Tax on Alyeska.

The judgment of the district court is AFFIRMED.

FERNANDEZ, Circuit Judge, concurring:

I concur. For the reasons set forth in my concurring opinion in *Alaska v. Native Village of Venetie Tribal Gov't,* No. 96–35042, slip op. 14907, 14943, — F.3d —, — (9th Cir. November 20, 1996), I do not believe that Indian country remains in most of Alaska. But, even if it does, the land involved here is not it.