Harold **DAWAVENDEWA, a single man, Plaintiff–Appellant,**

v.

**SALT RIVER PROJECT AGRICULTUR-AL IMPROVEMENT AND POWER DISTRICT, an Arizona corporation, De-fendant–Appellee.**

No. 97–15803.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 11, 1998.

Decided Sept. 14, 1998.

**1118**

Bradley H. Schleier, Schleier Law Offices, Phoenix, Arizona, for plaintiff-appellant.

John J. Egbert, Jennings, Strouss & Salmon, Phoenix, Arizona, for defendant-appellee.

Robert J. Gregory, Equal Employment Opportunity Commission, Washington, D.C., for amicus curiae.

Before: CHOY and REINHARDT, Circuit Judges, and RESTANI, International Court of Trade Judge.*

REINHARDT, Circuit Judge:

Harold Dawavendewa, a Native American, alleges that because he is a Hopi and not a Navajo, he was not considered for a position with a private employer operating a facility on the Navajo reservation. He contends that the employer's conduct constitutes unlawful employment discrimination under Title VII of the Civil Rights Act of 1964. To determine whether Dawavendewa's Title VII complaint may proceed, we address, first, whether discrimination based on tribal affiliation constitutes "national origin" discrimination, and, second, whether such discrimination is permitted under a Title VII provision that allows preferential treatment of Indians in certain specified circumstances.[1]

Salt River Project Agricultural Improvement and Power District ("Salt River"), an Arizona corporation, entered into a lease agreement with the Navajo Nation in 1969. The agreement allows Salt River to operate a generating station on Navajo land provided that it, among other things, grants employment preferences to members of the Navajo tribe living on the reservation, or, if none are available, to other members of the Navajo tribe.[2] This preference policy is consistent with Navajo tribal law. *See* 15 Navajo Nation Code § 604 (1995).

Dawavendewa, a member of the Hopi tribe, lives in Arizona less than three miles from the Navajo Reservation.[3] In 1991 he unsuccessfully applied for one of seven Operator Trainee positions at the Salt River generating station. He then filed a complaint alleging that Salt River was engaging in national origin discrimination in violation of Title VII. The complaint alleges that he took and passed a test for the position, ranking ninth out of the top twenty applicants, but was neither interviewed nor considered further for it because he was not a member of, or married to a member of, the Navajo Nation.

---

* The Honorable Jane A. Restani, International Court of Trade Judge, sitting by designation.

1. We use the terms Indian and Native American interchangeably throughout this opinion. While it is generally desirable for language to retain a fixed meaning, and while unnecessary changes in terminology exacerbate the problems we ordinarily have in understanding each other and in avoiding legal disputes, we recognize that the term Native American has become a part of the common parlance. Nevertheless, the statutes and opinions we examine use the term Indian, which was the appropriate word not so long ago.

2. The employment provision reads as follows:

Lessees agree to give preference in employment to qualified local Navajos, it being understood that "local Navajos" means members of the Navajo Tribe living on land within the jurisdiction of the Navajo Tribe. All unskilled labor shall be employed from "local Navajos,"
if available, providing that applicants for employment as unskilled laborers meet the general employment qualifications established by Lessees. Qualified semi-skilled and skilled labor shall be recruited and employed from among "local Navajos." In the event sufficient qualified unskilled, semi-skilled and skilled local Navajo labor is not available, or the quality of work of available skilled or semi-skilled workmen is not acceptable to Lessees, Lessees may then employ, in order of preference, first qualified non-local Navajos, and second, non-Navajos.

3. We note that the Hopi and Navajo Tribes have been involved in a number of longstanding disputes. *See, e.g., Hopi Tribe v. Navajo Tribe*, 46 F.3d 908 (9th Cir.1995) (rental value of homesites and grazing rights due Hopi Tribe under Navajo–Hopi Settlement Act of 1974); *Masayesva v. Hale*, 118 F.3d 1371 (9th Cir.1997) (recovery of damages relating to use of jointly-held lands).

Salt River moved to dismiss the complaint on the grounds that discrimination on the basis of tribal membership (as opposed to discrimination on the basis of status as a Native American) does not constitute "national origin" discrimination and that Title VII expressly exempts tribal preferences under § 703(i), 42 U.S.C. § 2000e–2 (i) (the "Indian Preferences exemption"). The district court granted the motion to dismiss. It held that Title VII exempts tribal preference policies, and therefore found it unnecessary to decide whether discrimination on the basis of tribal membership constitutes national origin discrimination under Title VII. Dawavendewa appeals.

### I.

■ We first address the issue whether discrimination on the basis of tribal membership constitutes "national origin" discrimination for purposes of Title VII. Title VII prohibits employers from discriminating on the basis of "race, color, religion, sex, or national origin." Civil Rights Act of 1964, § 703(a), 42 U.S.C. § 2000e–2 (a).[4] Although Title VII fails to define "national origin," we have observed that "the legislative history and the Supreme Court both recognize that 'national origin' includes the country of one's ancestors." *Pejic v. Hughes Helicopters, Inc.,* 840 F.2d 667, 673 (9th Cir.1988); *see Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 88, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973) (noting that "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came"). Further, the regulations implementing Title VII provide that discrimination on the basis of one's ancestor's "place of origin"—not *nation* of origin—is sufficient to come within the scope of the statute. *See* 29 C.F.R. § 1606.1.[5] Accordingly, a claim arises when discriminatory practices are based on the place in which one's ancestors lived.

Consistent with the regulations, we have held that the current political status of the nation or "place" at issue makes no difference for Title VII purposes. In *Pejic v. Hughes Helicopters, Inc.,* we considered the issue whether discrimination against Serbians constituted "national origin" discrimination. 840 F.2d 667, 673 (9th Cir.1988). The employer in *Pejic* contended that a Serbian employee could not bring a discrimination claim because Serbia as a nation had long been extinct. We rejected this argument and held that Serbians were a protected class:

> Unless historical reality is ignored, the term "national origin" must include countries no longer in existence.... Given world history, Title VII cannot be read to limit "countries" to those with modern boundaries, or to require their existence for a certain time length before it will prohibit discrimination. Animus based on national origin can persist long after new political structures and boundaries are established.

*Id.* (citation omitted); *see Roach v. Dresser Indus. Valve & Instr. Div.,* 494 F.Supp. 215, 218 (W.D.La.1980) (recognizing discrimination against "Cajuns" as national origin discrimination under Title VII although colony of Acadia no longer exists).

Under the principles set forth in *Pejic* and the Code of Federal Regulations, we have no trouble concluding that discrimination against Hopis constitutes national origin discrimination under Title VII. The status of Indian tribes among the international community and in relation to the United States has, of course, a complicated history that cannot be summarized briefly, and we will not attempt to do so. It is elementary, however, that the different tribes were at one time considered to be nations by the both the colonizing countries and later the United States. *See* William C. Canby, Jr., *Ameri-*

---

4. We note that claims of discrimination on the basis of one's status as a Native American are often brought as race discrimination claims, *see, e.g., Weahkee v. Perry,* 587 F.2d 1256 (D.C.Cir. 1978), although they have also been brought as national origin claims, *see Perkins v. Lake County Dep't of Utilities,* 860 F.Supp. 1262 (1994).

5. The regulation provides:

> The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.
>
> 29 C.F.R. § 1606.1.

*can Indian Law* 68 (1998). In 1832 Chief Justice Marshall wrote:

> The Indian nations had always been considered as distinct, independent, political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial. . . .
>
> The Cherokee nation, then is a distinct community, occupying its own territory, with boundaries accurately described. . . .

*Worcester v. State of Georgia,* 1832, 31 U.S. (6 Pet.) 515, 559–61, 8 L.Ed. 483. The Court has in more recent times recognized the erosion of the Indian tribes' "nation" status. *See Organized Village of Kake v. Egan,* 369 U.S. 60, 72, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) (Frankfurter, J.) (noting that "[b]y 1880 the Court no longer viewed reservations as distinct nations"). Currently, the different Indian tribes are generally treated as domestic dependent nations that retain limited powers of sovereignty. *See* William C. Canby, *American Indian Law* 72–87 (1998).

Because the different Indian tribes were at one time considered nations, and indeed still are to a certain extent, discrimination on the basis of tribal affiliation can give rise to a "national origin" claim under Title VII. The fact that "new political structures and boundaries" now exist has no significance. Further, even if the various tribes never enjoyed formal "nation" status, Section 1606.1 of the regulations makes clear that discrimination based on one's ancestor's "place of origin" is sufficient to state a cause of action. Accordingly, under the case law and the regulations interpreting Title VII, tribal affiliation easily falls within the definition of "national origin."

■ Salt River does not contend that the different Indian tribes are not "nations" for Title VII purposes. Rather, it relies on *Morton v. Mancari,* 417 U.S. 535, 552–554, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) for the proposition that employment preferences based on tribal affiliation are based on *political affiliation* rather than national origin and are thus outside the realm of Title VII. *Morton* involved a Due Process challenge to the Bureau of Indian Affair's policy hiring Indian applicants over non-Indian applicants. The Court found that the policy did not constitute an impermissible racial classification because it was "reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups." *Id.* at 554, 94 S.Ct. 2474. However, *Morton* did not involve a claim of discrimination on the basis of membership in a particular tribe. In fact, in *Morton* no claim was made of *any* violation of Title VII. *Morton* simply held that the employment preference at issue, though based on a racial classification, did not violate the Due Process clause because there was a legitimate non-racial purpose underlying the preference: the unique interest the Bureau of Indian Affairs had in employing Native Americans, or more generally, Native Americans' interests in self-governance—interests not present in this case. For these reasons, *Morton* does not affect our conclusion that discrimination in employment on the basis of membership in a particular tribe constitutes national origin discrimination.[6] We therefore conclude that differential employment treatment based on tribal affiliation is actionable as "national origin" discrimination under Title VII.

II.

■ We now consider whether Salt River's policy of favoring members of the Navajo tribe falls within the exception provided by 42 U.S.C. § 2000e–2(i) (the "Indian Preferences exemption").[7] The Indian Preferences exemption states that

---

6. For similar reasons, this circuit's holding in *Alaska Chapter, Associated Gen. Contractors of Am. v. Pierce,* 694 F.2d 1162 (9th Cir.1982), does not affect our conclusion. *Alaska Chapter* involved an equal protection challenge to a Department of Housing and Urban Development regulation that directs Indian Housing Authorities to give contracting preferences to Indian-owned businesses. That regulation, like the BIA's policy in *Morton* made no distinctions based on tribal affiliation. The court, relying on *Morton,* upheld the regulation on the ground that "[e]ncouraging and assisting Indian-owned businesses helps de-velop [leadership skills] and furthers the government's trust obligation to help the Indians develop economic self-sufficiency." *Id.* at 1170. *Alaska Chapter* involved an employment preference that was directly authorized by the Indian Self–Determination Act, which, as discussed below, was enacted directly for the furtherance of Native American self-governance.

7. We note that the Indian tribes themselves are exempt from Title VII liability under § 701(b).

[n]othing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which preferential treatment is given to any individual *because he is an Indian living on or near a reservation.*

42 U.S.C. § 2000(e)(2)(i) (emphasis added). Salt River maintains that its preferential treatment of Navajos is exempt from Title VII liability under this provision.

The issue whether the Indian Preferences exemption covers preferences on the basis of tribal affiliation has not been decided by the federal courts. The EEOC, however, addressed this precise issue in a 1988 Policy Statement. It concluded that the "extension of an employment preference on the basis of tribal affiliation is in conflict with and violates Section 703(i) of Title VII." *Policy Statement on Indian Preference Under Title VII*, Fair Empl. Prac. (BNA) 405:6647, 6653 (May 16, 1988). The Commission based its conclusion on three grounds. First, it interpreted the language of the exemption, which applies to preferential treatment towards "any individual because he is an Indian living on or near a reservation," as evidencing Congressional intent to disallow tribal distinctions and "to encourage the extension of employment opportunities to Indians generally." Fair Empl. Prac. 405:6654. It then considered two federal regulations, one issued by the Department of Labor, and the other by the Department of Interior, both of which specifically forbid federal contractors from discriminating on the basis of tribal affiliation as a part of general Indian preference policies. *See id.* (discussing 41 C.F.R. § 60–1.5(a)(6) (1987) and 48 C.F.R. § 1452.204–71 (1987)).[8] Finally, the Commission reasoned that the allowance of tribal preferences could result in inequities in cases in which employers are situated near the reservations of two tribes or near a reservation shared by more than one tribe. *Id.* The EEOC, which has filed an amicus brief on

this appeal, adheres to the position it adopted in the 1988 Policy Statement.

Generally, EEOC Guidelines are entitled to some deference. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The level of deference, however, depends on the EEOC's thoroughness of consideration, validity of its reasoning, consistency with earlier and later pronouncements, and power of persuasion. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 256, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).[9] "Ultimately, EEOC statements of policy 'should always be considered, but they should not be regarded as conclusive unless reason and statutory interpretation support their conclusion.'" *Yerdon v. Henry*, 91 F.3d 370, 376 (2nd Cir.1996) (internal citations omitted). We give the EEOC's Policy Statement due weight, and for reasons we make clear in the discussion which follows, we agree with its conclusion that the Indian Preferences exemption does not allow discrimination based on tribal affiliation.

We now examine the language and purpose of the statutory exemption. The exemption applies to "preferential treatment ... given to any individual *because he is an Indian* living on or near a reservation." § 2000e–2 (i) (emphasis added). The term "Indian" is generally used to draw a distinction between Native Americans and all others. *See Perkins v. Lake County Dep't of Utilities*, 860 F.Supp. 1262, 1274 (N.D.Ohio 1994) (citing *Felix S. Cohen's Handbook of Federal Indian Law* 2 (1971)). An employment practice of giving preference to members of a particular tribe does not afford preference to an applicant "because he is an Indian," but rather because he is a member of "a particular tribe." Such a preference is not consistent with the objectives of the Indian Preferences exemption. While the statute exempts the hiring of Indians from the force of the anti-discrimination in employment provisions, it does so in order to compensate for the effects of past and present unjust treat-

---

8. The Department of Interior regulation was implemented pursuant to the Indian Self–Determination and Education Assistance Act of 1975, 25 U.S.C. 450e(b).

9. A cynic might suggest that how much deference we give to an EEOC Guideline depends on

how much we agree with it, or even that we apply the Commission's Guidelines when we think they're right and don't when we think they're wrong. That's surely not what the Court intended in *Arabian Am. Oil Co.*, however.

ment, not in order to authorize another form of discrimination against particular groups of Indians—tribal discrimination. It seems evident that, under the exemption, favored treatment could not be given to Indian males at the expense of Indian women, or to Indians of mixed blood in derogation of the rights of those who are entirely of Indian ancestry. The purpose of the Indian Preferences exemption is to authorize an employer to grant preferences to *all* Indians (who live on..or near a reservation)—to permit the favoring of Indians over *non*-Indians. The exemption is not designed to permit employers to favor members of one Indian tribe over another, let alone to favor them over all other Indians. To so read the provision would be to immunize two forms of discrimination not just one—discrimination on account of Indian status and discrimination on account of tribal membership. The statute on its face reaches only the former. In short, we read the term "because he is an Indian" to mean precisely what it says. The reason for the hiring must be because the person is an Indian, not because he is a Navajo, a male Indian, or a member of any other formal subset of the favored class.

Salt River contends, however, that allowing tribal preferences would be "consistent with" the congressional intent underlying the Indian Preferences exemption provision. Its argument rests primarily on language from *Morton*, which, as discussed above, does not support its position. Indeed, Salt River can point to no legislative history that supports its reading of the Indian Preferences exemption.[10]

Instead, Salt River and the district court decision rely heavily on the 1994 amendments to the Indian Self–Determination and Education Assistance Act (ISDA). The ISDA, originally enacted in 1975, allows tribes to contract with the Departments of the Interior and Health and Human Services to administer programs otherwise administered by those Departments ("self-determination contracts") in order to establish

> a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

25 U.S.C. § 450(a)(b) (Supp.1998); *State of Alaska ex rel. Yukon Flats Sch. Dist. v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1299 (9th Cir.1996) ("as expressed by the Self–Determination Act, Indian self-determination involves increased participation of Native Americans in the administration of federal programs"), *rev'd on other grounds, Alaska v. Native Village of Venetie Tribal Gov't*, —— U.S. ——, 118 S.Ct. 948, 140 L.Ed.2d 30 (Feb. 25, 1998); *Pierce*, 694 F.2d at 1170 (noting that purposes of the Indian Self–Determination Act is to develop leadership skills as well as economic self-sufficiency). One subsection of the ISDA, § 450(b)(1), provides that contracts under the chapter must require that preferences be "given to Indians" with respect to training and employment opportunities. The 1994 Amendment provided that *despite* subsection 450(b)(1), "tribal employment or contract preference law adopted by such tribe will govern" with respect to self-determination contracts.[11]

---

**10.** The legislative history on this exemption is sparse. The EEOC points to general language that suggests that the Indian Preferences exemption was a means to combat the general problem of Indian unemployment on or near reservations rather than to promote the strength of individual tribes. *See Morton v. Mancari*, 417 U.S. 535, 545–46, 94 S.Ct. 2474, 41 L.Ed.2d 290 (quoting Remarks of Senator Humphrey, 110 Cong. Rec. 12723) (1964) ("This exemption is consistent with the Federal Government's policy of encouraging Indian employment and with the special legal position of Indians"). We generally find the legislative history to be inconclusive and do not rely on it.

**11.** The amendment provides in full:

> Notwithstanding subsections (a) and (b) of this section, with respect to any self-determination contract, or portion of a self-determination contract, that is intended to benefit one tribe, the tribal employment or contract preference laws adopted by such tribe shall govern with respect to the administration of the contract or portion of the contract.

25 U.S.C. § 450(c) (Supp.1998).

The 1994 Amendment was passed in response to a proposed regulation interpreting the ISDA to require preferences to Indians "regardless of tribal affiliation." 59 Fed.Reg. 3166, 3185 (Jan. 20, 1994).

The 1994 Amendment provides no support for Salt River's argument that Congress intended the Indian Preferences exemption to cover discrimination based on tribal affiliation. First, whatever Congress decided to do with respect to amending the ISDA in 1994 has little if anything to do with what it intended when it drafted Title VII thirty years earlier. Second, the ISDA and Title VII have fundamentally different purposes that make the analogy Salt River seeks to draw of little value: While Title VII provides relief for individual cases of discrimination by employers, the purpose of ISDA is to shift control of certain federal programs and services that benefit particular tribes to the tribes themselves. Third, the ISDA governs a very limited set of employment situations— those arising pursuant to particular contracts between tribes and two departments within the federal government. 25 U.S.C. § 450b(j); *see FGS Constructors, Inc. v. Carlow,* 64 F.3d 1230, 1234 (8th Cir.1995) (holding that, by definition, private parties cannot enter self-determination contracts). Salt River is unquestionably not an employer acting pursuant to a self-determination contract subject to the ISDA. Accordingly, we conclude that the tribal preferences exception contained in the ISDA does not support Salt River's interpretation of the Indian Preferences exemption.

To the contrary, we find that the recent amendment to the ISDA supports the EEOC's position. The fact that Congress felt the need to pass the 1994 Amendment only bolsters the contention that general Indian preference policies were not intended to allow distinctions among different tribes. When Congress decided that tribal affiliation preferences were appropriate in the context of self-determination contracts, it responded through the enactment of the 1994 Amend-

ment.[12] It has passed no similar amendment with respect to Title VII. The fact that Congress now requires a narrowly-defined set of contracts to honor local tribal preference policies not only fails to support the argument that it intended to accomplish that same objective in 1964 when passing Title VII, but it suggests quite the opposite proposition. It shows us that when Congress wishes to allow tribal preferences, it adopts an appropriate amendment to the applicable statute.[13]

Salt River's final argument is that subjecting Salt River to Title VII liability would "frustrate" the purposes of the ISDA as amended in 1994. There is, however, no conflict between allowing tribal preferences under a self-determination contract, the entire purpose of which is to promote the *self-governance* of a tribe through the administration of federal programs, and not allowing those preferences in other private employment situations. As already mentioned, there is no contention that the Salt River agreement falls within the scope of the ISDA and little argument that permitting discrimination against Hopi Indians would help achieve the goals of the ISDA. Preferential employment of Navajo Indians on a privately-owned facility, while certainly helpful to the tribe's employment problems, has little to do with increasing the tribe's capacity for self-governance. Further, other federal regulations that provide for general Indian preferences in employment contexts explicitly disallow discrimination based on tribal affiliation. *See, e.g.,* 23 C.F.R. § 635.117(d) (1997) (employment by state highway agencies); 25 C.F.R. § 256.3(b) (1997) (participation in Housing Improvement Program of BIA).[14] We conclude that Congress' decision to permit tribal preferences under the ISDA is in no way frustrated by our construction of

---

**12.** There is no indication that the 1994 Amendment was merely a "clarifying" amendment. Indeed, the 1994 Amendment begins, *"Notwithstanding* subsections (a) and (b) of this section." Accordingly, Congress felt the need to indicate that *despite* the general Indian preference policy, tribal preference policies would apply.

**13.** Salt River argues that the Policy Statement has lost persuasive value because one of the regulations on which it relies has been superseded by the 1994 Amendment. For the reasons just discussed, Congress' actions with respect to the

ISDA and the revision of regulations pursuant to those actions does not affect our interpretation of the Title VII exemption.

**14.** Salt River questions the continuing validity of these regulations in light of the 1994 Amendment. As discussed above, the 1994 Amendment only affected a particular set of employment situations. Congress simply has not instituted a blanket-approval of tribal preferences in the context of either federal employment or private employment.

Title VII as precluding such preferences in other types of employment.[15]

Finally, we note the possible inequities that would arise in allowing tribal affiliation discrimination, particularly in areas where there are many different tribal reservations. Under Salt River's interpretation of the provision, any private employer situated near a Hopi *and* Navajo reservation could arbitrarily institute a blanket-policy of preferential treatment towards members of one or the other of the tribes. Further, private employers would have license to pass over those Native Americans who live on a particular reservation but who do not share the same tribal affiliation as the governing body of the reservation.[16] Without a clear indication to the contrary, this appears to be the sort of individual discrimination wholly within the scope of Title VII.

Based on our reading of the Indian Preferences exemption, and informed by the 1994 Amendment to the ISDA, we conclude that the exemption does not include preferences based on tribal affiliation. If Congress wishes to amend Title VII to accommodate tribal preferences, as it did with respect to the ISDA, it may do so. Because Congress has not yet chosen that course, and because there is no dispute that the Salt River policy constitutes a tribal preference policy, the district court erred in dismissing the complaint.

## CONCLUSION

We conclude that Salt River's conduct as described in the complaint constitutes "national origin" discrimination under Title VII and does not fall within the scope of the Indian Preferences exemption. Accordingly, the district court's Rule 12(b)(6) dismissal was improper, and we reverse.

REVERSED AND REMANDED.

---

**15.** We do note, however, that a conflict between Title VII and ISDA may arise when a private employer is hired pursuant to the ISDA. Because this conflict does not arise here, we do no attempt to resolve it and limit our holding to employment situations that do not fall within the scope of 28 U.S.C. 450e(c).

**16.** *See Hopi Tribe v. Navajo Tribe,* 46 F.3d 908, 911 (9th Cir.1995) (noting "continued presence of Navajo Indians on 900,000 acres of the Hopi Reservation in northern Arizona").