**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *Plaintiff-Appellant*, v. PEABODY WESTERN COAL COMPANY; NAVAJO NATION, Rule 19 defendant, *Defendants-Appellees*, v. KEVIN K. WASHBURN, Esquire; SALLY JEWELL, in her official capacity as Secretary of the Interior, *Third-Party-Defendants-Appellees*. | No. 12-17780 D.C. No. 2:01-cv-01050-JWS ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Arizona
John W. Sedwick, District Judge, Presiding

Argued and Submitted
May 12, 2014—San Francisco, California

Filed September 26, 2014
Amended November 19, 2014

Before: Susan P. Graber, William A. Fletcher,
and Richard A. Paez, Circuit Judges.

Opinion by Judge W. Fletcher

**SUMMARY**[*]

### Title VII / Tribal Affairs

The panel filed an order amending its previous opinion, and in the amended opinion the panel affirmed the district court's summary judgment against the Equal Employment Opportunity Commission with respect to its claim that Title VII of the Civil Rights Act of 1964 prohibited the tribal hiring preference contained in Peabody Western Coal Company leases with the Navajo Nation.

The panel held that the Navajo hiring preference in the leases was a political classification, rather than a classification based on national origin, and therefore did not violate Title VII. The panel concluded that the district court correctly granted summary judgment to defendants Peabody Western Coal Company and Navajo Nation, and third-party defendant Secretary of the Interior. The panel also held that the EEOC waived on appeal its record-keeping claim. Finally, the panel held that the district court acted within its discretion in denying the EEOC's eleventh-hour motion to supplement the record with a declaration and documents about Peabody's hiring practices in 1999.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

P. David Lopez, General Counsel, Lorraine C. Davis, Acting Assistant General Counsel, and Susan Ruth Oxford (argued), Attorney, Equal Employment Opportunity Commission, Washington, D.C., for Plaintiff-Appellant.

John F. Lomax, Jr. (argued) and Kathryn Hackett King, Snell & Wilmer LLP, Phoenix, Arizona; Louis Denetsosie, Attorney General, and Paul Spruhan, Assistant Attorney General, Navajo Nation Department of Justice, Window Rock, Arizona; Lisa M. Enfield (argued), Paul E. Frye, and William Gregory Kelly, Frye Law Firm PC, Albuquerque, New Mexico, for Defendants-Appellees.

Robert Dreher, Acting Assistant Attorney General, Ethan G. Shenkman (argued), Deputy Assistant Attorney General, James C. Kilbourne, Section Chief, and Kristofor Swanson, United States Department of Justice, Washington, D.C., for Third-Party-Defendants-Appellees.

---

**ORDER**

Plaintiff-Appellant's motion to amend the court's opinion is GRANTED. The Opinion, filed on September 26, 2014, and reported at 768 F.3d 962 (9th Cir. 2014), is amended as follows:

At Slip Op. 22, 768 F.3d at 974, the sentence beginning with <The Indian preference exemption> and ending with <does not extend to Indians.> is deleted and replaced with:

The Indian preference exemption contained in Section 703(i) is therefore necessary to clarify that Title VII's prohibition against racial or national origin discrimination does not extend to preferential hiring of Indians living on or near reservations.

An Amended Opinion is filed concurrently with this Order.

---

## OPINION

W. FLETCHER, Circuit Judge:

Peabody Western Coal Co. ("Peabody") mines coal at the Black Mesa Complex and Kayenta mines on the Hopi and Navajo reservations in northeastern Arizona under leases with the tribes. At issue in this appeal are two leases with the Navajo Nation ("the Nation") that permit Peabody to mine coal on Navajo reservation land. Each lease requires Peabody to give preference in employment to "Navajo Indians." Both leases received approval from the Department of the Interior ("Interior") under the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a, 396e ("IMLA"). Since at least as early as the 1940s, Interior-approved mineral leases, including the two at issue here, have routinely included tribal hiring preference provisions.

This appeal is the latest stage in a long-running legal dispute about the tribal hiring preferences.[1]  The Equal Employment Opportunity Commission ("EEOC") sued Peabody in the District of Arizona in 2001, alleging that Peabody's implementation of the tribal hiring preference constituted national origin discrimination in violation of Title VII of the Civil Rights Act of 1964.  The EEOC also claimed that Peabody had violated Title VII's record-keeping requirements.  *See* 42 U.S.C. § 2000e-8(c).  Several years of litigation on procedural matters resulted in the joinder of the Nation under Federal Rule of Civil Procedure 19 and impleader of the Secretary and Assistant Secretary of the Interior (collectively, "the Secretary") under Federal Rule of Civil Procedure 14.  The principal issue now before us is the EEOC's claim that Title VII prohibits the tribal hiring preference contained in the Peabody leases.

In the decision now on appeal, the district court granted summary judgment against the EEOC on the merits.  It held that the Navajo hiring preference in the leases is a political classification, rather than a classification based on national origin, and therefore does not violate Title VII.  We have

---

[1] The previous opinions in this case are *EEOC v. Peabody Coal Co.* (*Peabody I*), 214 F.R.D. 549 (D. Ariz. 2002); *EEOC v. Peabody W. Coal Co.* (*Peabody II*), 400 F.3d 774 (9th Cir. 2005); *EEOC v. Peabody W. Coal Co.* (*Peabody III*), No. CV 01-01050, 2006 WL 2816603 (D. Ariz. Sept. 30, 2006); *EEOC v. Peabody W. Coal Co.* (*Peabody IV*), 610 F.3d 1070 (9th Cir. 2010); and *EEOC v. Peabody W. Coal Co.* (*Peabody V*), No. 01-CV-01050, 2012 WL 4339208 (D. Ariz. Sept. 20, 2012).  Other issues pertaining to Peabody's operations on the Nation's land have also been the subjects of litigation, in this court and elsewhere.  *See United States v. Navajo Nation*, 537 U.S. 488 (2003); *Peabody Coal Co. v. Navajo Nation*, 373 F.3d 945 (9th Cir. 2004); *Navajo Nation v. Peabody Holding Co.*, 209 F. Supp. 2d 269 (D.D.C. 2002); *see also Clinton v. Babbitt*, 180 F.3d 1081, 1083–86 (9th Cir. 1999).

jurisdiction over the EEOC's appeal pursuant to 28 U.S.C. § 1291. We agree with the district court that the tribal hiring preference is a political classification. We therefore affirm.

## I. Background

Peabody's predecessor-in-interest entered into two leases with the Navajo Nation. The first, Lease No. 8580, signed in 1964, permits Peabody to mine coal on the Navajo reservation. The second, Lease No. 9910, signed in 1966, permits Peabody to mine on reservation land formerly held in trust for both the Navajo and Hopi tribes, now partitioned between the tribes.

In Lease No. 8580, Peabody "agrees to employ Navajo Indians when available in all positions for which, in the judgment of [Peabody], they are qualified, and to pay prevailing wages to such Navajo employees and to utilize services of Navajo contractors whenever feasible." The lease also provides that Peabody "shall make a special effort to work Navajo Indians into skilled, technical and other higher jobs in connection with [its] operations under this lease." Lease No. 9910 contains a similar provision, and also states that Peabody "may at its option extend the benefits of [the hiring preference] to Hopi Indians." Interior drafted the leases and required the inclusion of the Navajo hiring preferences. The leases were approved by Interior under the IMLA. *Peabody IV*, 610 F.3d at 1075.

In 1998, two members of the Hopi Tribe and one member of the Otoe Tribe filed discrimination charges with the EEOC. They alleged that they had applied to Peabody for positions for which they were qualified, and that they were not hired because they were not Navajo. After an

investigation, the EEOC sued Peabody in federal district court in Arizona in 2001. The EEOC alleged that Peabody's implementation of the tribal hiring preference provisions constituted national origin discrimination forbidden by Title VII.

After the EEOC brought its Title VII claims, Peabody moved for summary judgment. The district court granted the motion on two grounds, holding that the suit presented a nonjusticiable political question and that the Nation was a necessary party for whom joinder was not feasible. *Peabody I*, 214 F.R.D. at 560–61. We reversed, holding that the suit did not present a political question and that Rule 19 joinder was feasible, provided that the EEOC sought no affirmative relief against the Nation. *Peabody II*, 400 F.3d at 778. The Supreme Court denied review. *Peabody W. Coal Co. v. EEOC*, 546 U.S. 1150 (2006) (mem.).

On remand, the EEOC amended its complaint to join the Nation under Rule 19. The district court again granted summary judgment against the EEOC. It held that the EEOC sought affirmative relief against the Nation, defeating Rule 19 joinder; that the Secretary was a necessary party for whom joinder was not feasible; and that the tribal hiring preference did not violate Title VII because it was authorized by the Navajo-Hopi Rehabilitation Act of 1950, 25 U.S.C. §§ 631–638. *Peabody III*, 2006 WL 2816603.

On appeal, we reversed in part and vacated in part. We again held that joinder of the Nation was feasible. We held further that, although the EEOC could not join the Secretary as a defendant under Rule 19, Peabody or the Nation could implead the Secretary as a third-party defendant under Rule 14(a) on claims for injunctive or declaratory relief. We

vacated the judgment on the Title VII claim in order to allow the district court to consider the Secretary's arguments. *Peabody IV*, 610 F.3d 1070. The Supreme Court again denied review. *EEOC v. Peabody W. Coal Co.*, 132 S. Ct. 91 (2011) (mem.).

On remand, the EEOC filed a second amended complaint. Peabody impleaded the Secretary and counterclaimed against the EEOC for declaratory relief. The district court granted the EEOC's motion to dismiss Peabody's counterclaims.

The Secretary then moved for summary judgment on Peabody's third-party complaint on the ground that the tribal hiring preferences in the leases were permissible under Title VII. The Nation and Peabody also moved for summary judgment.

The day before argument on those motions, the EEOC moved to supplement the record with the declaration and supporting documents of a former EEOC investigator who had interviewed Peabody's hiring officials in 1999. The district court denied the motion as untimely, noting that the information that the EEOC sought to introduce had long been available, and that, in any event, the information was not relevant because it pertained to pre-1999 practices.

The district court upheld the tribal hiring preferences in the leases. After "an examination of the status of Indian tribes in general and their relationship to the federal government," and drawing on the principles the Supreme Court articulated in *Morton v. Mancari*, 417 U.S. 535 (1974), the court held that the preference was a political classification rather than a national origin classification. The EEOC timely

appealed the grant of summary judgment and the denial of its motion to supplement the record.

## II.  Standard of Review

We review de novo a district court's grant of summary judgment.  *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 814 (9th Cir. 2002).  We review for abuse of discretion a district court's denial of a motion to supplement the record.  *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc., of Ariz.*, 84 F.3d 1186, 1192 (9th Cir. 1996).

## III.  Discussion

### A.  Title VII National Origin Discrimination

The EEOC argues that Title VII prohibits hiring preferences based on tribal affiliation, which it contends is a form of impermissible national origin discrimination.  The EEOC is responsible for overseeing the implementation and enforcement of Title VII.  42 U.S.C. § 2000e-14.  The Secretary argues that the tribal hiring preferences are based on political classifications that Title VII does not reach.  The Secretary maintains that tribal hiring preferences serve to promote tribal self-governance in accordance with congressionally mandated federal Indian policy.  None of the parties has argued that *Chevron* deference applies to the EEOC's or Interior's interpretations of the statutes each is charged with administering.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

The question before us is one of first impression.  But we do not walk on untrodden ground.  We have previously stated that differential treatment in employment based on tribal

affiliation can give rise to a Title VII national origin discrimination claim. *See Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.* (*Dawavendewa I*), 154 F.3d 1117 (9th Cir. 1998). Outside the context of Title VII, however, we have recognized that where differential treatment serves to fulfill the federal government's special trust obligation to the tribes as quasi-sovereign political entities, tribal preferences are permissibly based on political classifications. *Means v. Navajo Nation*, 432 F.3d 924, 932 (9th Cir. 2005); *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1278 (9th Cir. 2004); *see Mancari*, 417 U.S. 535.

For the reasons that follow, we hold that the tribal hiring preferences in the Peabody leases are based on tribal affiliation, a political classification. We also hold that Title VII does not prohibit differential treatment based on this political classification.

### 1. Statutory Framework

We begin by reviewing the relevant provisions of the IMLA and of Title VII.

### a. The Indian Mineral Leasing Act of 1938

The Peabody leases are authorized and governed by the IMLA. *See United States v. Navajo Nation*, 537 U.S. 488, 495 (2003). That statute provides, in relevant part:

> On and after May 11, 1938, unallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction, except those specifically excepted from the provisions of

> sections 396a to 396g of this title, may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

25 U.S.C. § 396a.

The IMLA was "designed to advance tribal independence." *Navajo Nation*, 537 U.S. at 494. Congress "aimed to foster tribal self-determination by giving Indians a greater say in the use and disposition of the resources found on Indian lands." *Id.* (internal quotation marks and alteration omitted). The IMLA was intended (1) to achieve "uniformity so far as practicable of the law relating to the leasing of tribal lands for mining purposes," H.R. Rep. No. 1872, 75th Cong., 3d Sess., at 1 (1938); (2) to ensure that Indians received "the greatest return from their property," *id.* at 2; and (3) to "bring all mineral-leasing matters in harmony with the Indian Reorganization Act," *id.* at 3. *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 n.5 (1985).

The Indian Reorganization Act ("IRA"), also known as the Wheeler-Howard Act, enacted four years prior to the IMLA, has been described as "probably the most important single statute affecting Indians . . . since its passage." Elmer R. Rusco, A Fateful Time: The Background and Legislative History of the Indian Reorganization Act, at ix (2000). The drafters of the IRA sought to reverse half a century of assimilationist policy. *See id.* at 62, 180. The IRA was a comprehensive reform statute, providing, among other things, for tribal self-government, restoration of lands to tribal

ownership, economic development, and vocational training. Indian Reorganization Act, 48 Stat. 984, Pub. L. No. 73-383 (1934) (codified as amended at 25 U.S.C. § 461 et seq.). In the decades since its enactment, the IRA has been criticized for the lack of involvement of Indian communities during the drafting process, as well as for perceived failures in its implementation. Rusco, *supra*, at x–xi, 190. But it remains the case that the statute was conceived as a means to restore tribal sovereignty and to promote the tribes' self-governance and economic independence. *Mancari*, 417 U.S. at 542 & n.12 (quoting the statement of John Collier, Commissioner of Indian Affairs, that the IRA "is designed not to prevent the absorption of Indians in white communities, but rather to provide for those Indians unwilling or unable to compete in the white world some measures of self-government in their own affairs"); *see generally* Rusco, *supra*.

In enacting the IMLA, Congress expressly intended to further the policy goals articulated in the IRA. In the IMLA, Congress delegated broad discretion to the Secretary to approve mineral leases. *See Navajo Nation*, 537 U.S. at 494–95. The IMLA does not mention hiring preferences of any kind, but in the exercise of its discretionary authority, Interior since the 1940s has routinely approved mineral leases that require a tribe's lessee to give preference in hiring to members of that tribe. This long-established practice serves to ensure that the economic value of the mineral leases on tribal lands inures to the benefit of the tribe and its members, consistent with the purpose of the IMLA.

Stewart Udall, Secretary of the Interior when the Peabody leases were prepared, stated in a declaration and in a deposition that Interior negotiated and drafted the leases. He affirmed that the Navajo preference provisions were a "key

provision," given the economic importance of coal resources on the reservations. *Peabody IV*, 610 F.3d at 1075. Secretary Udall understood Interior's role in approving mining leases as carrying out a special trust duty owed to Indian tribes in general and, with respect to these leases, owed in particular to the Navajo and Hopi tribes whose coal was being mined.

### b.  Title VII of the Civil Rights Act of 1964

Title VII prohibits discrimination in employment on the grounds of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The EEOC contends that the tribal preference in the leases violates the prohibition against national original discrimination. Title VII does not define "national origin." The legislative history tells us very little about Congress's understanding of the term. The only discussion of "national origin" came in the context of permitting employers to indicate hiring preferences based on sex, religion, or national origin where those qualities are a "bona fide occupational qualification." That discussion centered on the distinction between discrimination based on race and discrimination based on national origin. Representative James Roosevelt stated, "May I just make very clear that 'national origin' means national. It means the country from which you or your forebears came from. You may come from Poland, Czechoslovakia, England, France, or any other country." EEOC, Legislative History of Titles VII and XI of the Civil Rights Act of 1964, at 3179–80 (1968); 110 Cong. Rec. 2549 (1964). Representative John Dent stated, "National origin, of course, has nothing to do with color, religion, or the race of an individual. A man may have migrated here from Great Britain and still be a colored person." EEOC, *supra*, at 3180; 110 Cong. Rec. 2549 (1964).

Title VII contains two provisions specifically addressing Indian tribes. First, it provides that the term "employer" does not include "an Indian tribe," thus excluding Indian tribal governments entirely from coverage under Title VII. 42 U.S.C. § 2000e(b). Second, Section 703(i), known as the "Indian Preference exemption," expressly permits preferential hiring over non-Indians of Indians living on or near reservations. It provides:

> Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

42 U.S.C. § 2000e-2(i).

The legislative history of Section 703(i) is sparse. We at least know that it was intended to help remedy past and present discrimination against Indians as a "minority group." *See* 110 Cong. Rec. 13,702 (statement of Sen. Karl Mundt). We have previously noted that "the primary impetus behind § 703(i) was concern that by enacting Title VII Congress would render unlawful otherwise permissible hiring preferences for Native Americans." *Malabed v. N. Slope Borough*, 335 F.3d 864, 871 (9th Cir. 2003). The exemption was designed "to protect existing or future preference programs." *Id.*; *see also* 110 Cong. Rec. 13,702 (statement of Sen. Karl Mundt) (stating that Section 703(i), along with the exclusion of Indian tribes from Title VII's definition of "employer," "will assure our American Indians of the

continued right to protect and promote their own interests and to benefit from Indian preference programs now in operation or later to be instituted"). But the legislative history and statutory text give little indication as to Congress's views, if any, on preferences for tribal members over Indians from other tribes, as distinct from general preferences for Indians over non-Indians.

The EEOC issued a policy statement in 1988 in which it concluded that Section 703(i) is limited to general Indian hiring preferences and does not, in itself, authorize preferential employment practices based on tribal affiliation—a statement to which we have accorded deference. *See Dawavendewa I*, 154 F.3d at 1121. But this statement does not end the inquiry. That Section 703(i) does not itself authorize or create an exemption for tribal hiring preferences on or near Indian reservations does not dispose of the question before us: whether Title VII's prohibition against national origin discrimination prohibits the tribal hiring preferences in the mineral leases.

## 2. Tribal Affiliation and National Origin

The correspondence between tribal membership, on the one hand, and national origin, on the other, is not self-evident. *See generally* Matthew L.M. Fletcher, *Tribal Membership and Indian Nationhood*, 37 Am. Indian L. Rev. 1 (2013). Tribal membership, often based on blood quantum and lineage, *see id.* at 4, incorporates notions of race and ethnicity that the drafters of Title VII explicitly understood the term "national origin" to exclude. The federal government's interactions with Indians have, in many cases, shaped their political structures and constituencies, such that even the notion of the tribe may lack direct correlation with actual or

historical group politics. *See* Felix S. Cohen, *Handbook of Federal Indian Law* § 3.02[3], at 133 (Nell Jessup Newton ed., 2012); *see also id.* § 14.03[2][b], at 954 ("[T]he very concept of enrollment and maintenance of citizenship lists is largely an artifact of federal actions."); Carole Goldberg-Ambrose, *Of Native Americans and Tribal Members: The Impact of Law on Indian Group Life*, 28 Law & Soc'y Rev. 1123, 1131–33 (1994). Nonetheless, our decision in *Dawavendewa I* established that, at least in some cases, a tribal hiring preference can give rise to a Title VII national origin discrimination claim.

At issue in *Dawavendewa I* was the claim of a Hopi Indian who had been denied employment at a power station on a Navajo reservation, the Salt River Project ("SRP"), pursuant to a tribal hiring preference in the power company's lease agreement with the Navajo Nation. *Id.* at 1118. We held at the pleading stage that the plaintiffs had stated a Title VII national origin discrimination claim sufficient to survive a motion to dismiss. *Id.* at 1124. We observed that, in its implementing regulations, the EEOC has given the term "national origin" an expansive construction that could plausibly be read to encompass tribal affiliation. *Id.* at 1119. The EEOC "defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1 (2012). We also drew on our own broad construction of the term. In *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667 (9th Cir. 1988), we had written: "Unless historical reality is ignored, the term 'national origin' must include countries no longer in existence. Given world history, Title VII cannot be read to

limit 'countries' to those with modern boundaries, or to require their existence for a certain time length before it will prohibit discrimination." *Id.* at 673 (citation omitted).

In light of this, we held in *Dawavendewa I* that, "[b]ecause the different Indian tribes were at one time considered nations, and indeed still are to a certain extent, discrimination on the basis of tribal affiliation can give rise to a 'national origin' claim under Title VII." 154 F.3d at 1120. We noted that "Native Americans' interests in self-governance" were not at issue. *Id.* We suggested that the presence of such interests would trigger a separate analysis, grounded in the Supreme Court's decision in *Mancari*, and its recognition that at least some forms of preferential treatment of Indians are based on political classifications rather than national origin. *Id.*; *see infra* Subsection III.A.3. We also held, giving EEOC's 1988 policy statement "due weight," that Section 703(i) did not authorize tribal hiring preferences. *Dawavendewa I*, 154 F.3d at 1121–22.

The EEOC contends that our analysis must begin and end with *Dawavendewa I*. But four years later, in a second appeal in that case, we limited the scope of what we had earlier written. In *Dawavendewa v. Salt River Project Agricultural Improvement & Power District* (*Dawavendewa II*), 276 F.3d 1150 (9th Cir. 2002), we heard an appeal from the district court's dismissal of a claim for failure to join the Nation as a defendant under Rule 19. We affirmed. In doing so, we specifically rejected the plaintiffs' contention that we had previously held that Salt River Project's hiring practices violated Title VII. We wrote in *Dawavendewa II* that *Dawavendewa I*

> held only that a hiring preference policy based on tribal affiliation, as described in the complaint, stated a [national origin discrimination] claim upon which relief could be granted. . . . [W]e did not address the merits of the Nation's proffered legal justifications in defense of the challenged hiring preference policy. In particular, *we declined to consider whether the Nation's 1868 Navajo Treaty, the federal policy fostering tribal self-governance, the [Navajo Preference in Employment Act], or any other legal defense justified SRP's hiring preference policy*.

*Dawavendewa II*, 276 F.3d at 1158 (emphasis added) (citation omitted). We observed that "[i]n appropriate situations, federal law yields out of respect for treaty rights or the federal policy fostering tribal self-governance." *Id.* As we explain below, this case presents such a situation.

### 3. Tribal Affiliation as Political Classification

In *Mancari*, non-Indian employees of the Bureau of Indian Affairs ("BIA") sued to enjoin the implementation of a provision of the IRA that granted appointment and promotion preferences to Indians seeking positions in the BIA. *See* 25 U.S.C. § 472. The plaintiffs argued that the preference was contrary to, and impliedly repealed by, the 1972 Equal Employment Opportunity Act's ("EEOA") prohibition against race-based discrimination in federal employment, and that it constituted invidious racial discrimination in violation of the Due Process Clause of the

Fifth Amendment. *Mancari*, 417 U.S. at 537, 547. The Court rejected both arguments. *Id.* at 551, 553–54

The Court held that the EEOA had not impliedly repealed the BIA employment preference. *Id.* at 551. The Court noted that the "overriding purpose of [the IRA] was to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically," and that the participation of Indians in the operation of the BIA was crucial to achieving that goal. *Id.* at 542–43. The Court observed that Title VII explicitly exempts tribal employers from its coverage and permits the preferential hiring of Indians on or near Indian reservations. *Id.* at 547–48. "It would be anomalous to conclude that Congress intended to eliminate the longstanding statutory preferences in BIA employment, as being racially discriminatory, at the very same time it was reaffirming the right of tribal and reservation-related private employers to provide Indian preference." *Id.* at 548. The Court noted further that Congress had enacted Indian preferences in other legislation contemporaneous to Title VII, which suggested that it likely did not intend to repeal the Indian preference in the IRA by passing Title VII. *Id.* at 548–49.

The Court also held that the Indian employment preference did not constitute invidious racial discrimination in violation of the Due Process Clause. The IRA reflected the congressional determination that "proper fulfillment of its trust [obligations] required turning over to the Indians a greater control of their own destinies." *Id.* at 553. The Court reasoned that "[t]he preference . . . is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." *Id.* at 554. The

Indian employment preference was not based on a racial designation but on a political preference that triggered only rational-basis review. *Id.* "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 555. The preference was "reasonable and rationally designed to further Indian self-government" and did not violate due process. *Id.*

The Court has reaffirmed *Mancari* on several occasions. The Court continues to distinguish between permissible differential treatment of Indian tribes based on political classifications, on the one hand, and impermissible differential treatment of groups based on racial or national origin classifications, on the other. In *Rice v. Cayetano*, 528 U.S. 495 (2000), the Court stated,

> Of course, as we have established in a series of cases, Congress may fulfill its treaty obligations and its responsibilities to the Indian tribes by enacting legislation dedicated to their circumstances and needs. As we have observed, "every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal Indians."

*Id.* at 519 (citations omitted) (alteration in original) (quoting *Mancari*, 417 U.S. at 552). We have applied the distinction in our own cases. *See, e.g.*, *Kahawaiolaa*, 386 F.3d at 1278; *see also Means*, 432 F.3d at 932–33 (applying *Mancari* and upholding against an equal-protection challenge a law subjecting to tribal criminal jurisdiction a person who is not

a member of the tribe, but is an enrolled member of a different Indian tribe).

We recognize that *Mancari* addressed a political classification providing a general Indian hiring preference rather than a tribe-specific preference.  But *Mancari*'s logic applies with equal force where a classification addresses differential treatment between or among particular tribes or groups of Indians.  Indeed, based on *Mancari*, the Court has specifically upheld differential treatment among Indians.  In *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73 (1977), the Court addressed Congress's distribution of an award by the Indian Claims Commission for claims arising out of an illegal sale of Delaware tribal lands in the nineteenth century.  Congress distributed funds to two federally recognized tribes—the Cherokee Delawares and the Absentee Delawares—and to members of those two tribes. *Id.* at 79–80.  However, Congress did not distribute funds to the Kansas Delawares, an unrecognized tribe, or to its members, even though the Kansas Delawares, like Cherokee Delawares and Absentee Delawares, were descendants of the Delawares whose lands had been illegally sold. *Id.* at 79–82. In upholding the differentiation between the two groups of Delawares, the Court wrote that "the legislative judgment should not be disturbed '[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians.'" *Id.* at 85 (alteration in original) (quoting *Mancari*, 417 U.S. at 555); *see also Kahawaiolaa*, 386 F.3d at 1279 ("Congress certainly has the authority to single out a constituency of tribal Indians in legislation dealing with Indian tribes and reservations." (internal quotation marks omitted)).

The Navajo tribal hiring preferences in this case are based on the policy considerations that undergird *Mancari*. As we have noted above, Congress intended the IMLA to be read in harmony with the IRA, which had been enacted only four years earlier. A key purpose of the IRA was the advancement of tribal self-government. "[T]he IMLA aimed to foster tribal self-determination by giving Indians a greater say in the use and disposition of resources found on Indian lands." *Navajo Nation*, 537 U.S. at 494 (internal quotation marks and alteration omitted). Where the exploitation of mineral resources on a particular tribe's reservation is concerned, the federal government's responsibility necessarily runs to that tribe, not to all Indians.

We therefore have no difficulty concluding that the tribal hiring preferences here are based on a political classification within the meaning of *Mancari*. Peabody accords preference in hiring to members of the Navajo Nation, pursuant to the terms of Interior-approved leases. Interior viewed those preferential hiring provisions as useful in ensuring that the economic benefits flowing from the "most important resource" on the Navajo reservation accrued to the tribe and its members. Measures intended to preserve for the Nation and its members the fruits of the resources found on the tribe's own land are "rationally designed" to fulfill the federal government's trust obligations to the tribe.

This conclusion, however, does not completely answer the question before us. *Mancari* did not involve a claim brought directly under Title VII. Title VII was implicated only to the extent the plaintiffs claimed that the EEOA, an amendment to Title VII, impliedly preempted the BIA hiring preference. *See* 417 U.S. at 537. The precise question before us is whether Title VII's specific prohibition on national

origin discrimination extends to what the Supreme Court would later characterize in *Mancari* as a political classification. We conclude that Title VII does not prohibit differential treatment based on tribal affiliation, the political classification at issue here.

As we described above, Title VII contains two provisions concerning Indians: (1) an exclusion of tribal governments from the definition of "employer," and (2) a general exemption from Title VII for preferential hiring of Indians. The Indian preference exemption expressly permits the preferential hiring of "an Indian living on or near a reservation." 42 U.S.C. § 2000e-2(i). "There is no universally applicable definition" of the term "Indian." Cohen, *supra*, § 3.03[1], at 171. Title VII itself does not contain a definition of the term, but we noted in *Dawavendewa I* that it is "generally used to draw a distinction between Native Americans and all others." 154 F.3d at 1121.

The EEOC would have us infer from the Indian hiring preferences expressly authorized in Section 703(i) that Title VII allows only preferences that distinguish between Indians and non-Indians. *See* 42 U.S.C. § 2000e-2(i). We disagree with the EEOC's interpretation. Section 703(i) is an exemption from Title VII. The nature of the exemption helps us understand the reach of Title VII's prohibitions. The term "Indian" in Section 703(i) of Title VII describes a broad nonpolitical class. The term covers any Indian living on or near a reservation; qualification as an Indian under Section 703(i) is not based on the political classification of tribal affiliation. The Indian preference exemption contained in Section 703(i) is therefore necessary to clarify that Title VII's prohibition against racial or national origin discrimination

does not extend to preferential hiring of Indians living on or near reservations.

Congress was plainly aware that Title VII could have ramifications for Indian communities, and it saw clearly the need to mitigate those possible effects. For that reason, Congress excluded tribal employers from Title VII's scope and exempted general Indian hiring preferences. *See* 110 Cong. Rec. 13,702 (statement of Sen. Karl Mundt) (stating that Section 703(i), along with the exclusion of Indian tribes from Title VII's definition of "employer," "will assure our American Indians of the continued right to protect and promote their own interests and to benefit from Indian preference programs now in operation or later to be instituted"). However, Congress did not carve out from Title VII's prohibitions any similar exemption for preferences based on tribal affiliation. That Congress could have created such an exemption or exception, but saw no need to do so, suggests that it did not understand Title VII to reach tribal affiliation because such affiliation is a political classification. *See Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied . . . .").

Title VII is a general antidiscrimination statute. Both the text and the legislative history show that Congress anticipated possible effects of Title VII on federal Indian policy and crafted provisions specifically designed to preserve the status quo. Interior's approval of mineral leases containing tribal hiring preferences is a well-established practice that long predates the enactment of Title VII. Tribal hiring preferences were, and are, intended to further the policy goals embodied in the IRA and the IMLA. Nothing indicates that Congress

viewed Title VII as a recalibration of its policy toward tribal communities that had been articulated in its prior legislation. Nor is there any suggestion that Congress viewed Title VII as a specific disapproval of Interior's longstanding and settled practice of approving tribal hiring preferences in mineral leases. *Cf. Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) ("[L]ong-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent." (alterations in original) (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915)).

We therefore conclude that Title VII does not reach the tribal hiring preferences in the Peabody leases and affirm the district court's grant of summary judgment against the EEOC.

## B.  Motion to Supplement the Record

The EEOC argues that the district court erred in denying its motion to supplement the record.  On the eve of oral argument in the district court, the EEOC sought to include in the record a declaration and documents from a former EEOC investigator who interviewed former Peabody hiring officials about hiring practices in 1999.  The EEOC sought to use this information to demonstrate that Peabody gave hiring preferences to Indians who were not affiliated with the Navajo Nation, and thereby made hiring decisions based on national origin rather than tribal membership.  The district court denied the motion as untimely.

The district court did not abuse its discretion in denying leave to supplement the record.  There is no discernible reason why the EEOC could not have sought to introduce this evidence much earlier in the proceedings. *See* Fed. R. Civ. P.

6(b)(1)(B), (c)(1) (providing that motions must be served at least fourteen days prior to the hearing, unless the moving party has failed to act because of excusable neglect). At the time of the EEOC's eleventh-hour motion, the motions to dismiss and for summary judgment had been pending for several months. The information, collected in 1999, had been in the EEOC's possession for more than a decade.

We also note that the information is relevant only to an entirely new theory of relief. From the beginning of this litigation, the EEOC had argued that Peabody's contractual hiring practices violate Title VII because the leases give hiring preference to members of the Nation. By seeking to introduce the supplemental information, the EEOC sought to argue that Peabody makes individual hiring decisions based on national origin criteria, rather than on tribal membership. In the circumstances, we find no abuse of discretion in the district court's decision prohibiting the EEOC from raising a new theory at such a late stage in this lengthy litigation. We express no opinion on the legal merit of the EEOC's new theory, even assuming it could be supported by admissible evidence.

## C.  Record-keeping Claim

In addition to its Title VII national origin discrimination claim, the EEOC alleged in its complaint that Peabody had violated the record-keeping requirements of Title VII, 42 U.S.C. § 2000e-8(c), by failing to "make and preserve records relevant to the determination of whether unlawful employment practices have been or are being committed." The district court granted the defendants' motions for summary judgment and dismissed the EEOC's claims with

prejudice, but it did not specifically mention the record-keeping claim.

Although the EEOC states in its opening brief on appeal that it "continues to assert" the record-keeping claim, the brief is devoid of any argument in support of that claim. Generally, we do not consider claims that are not "specifically and distinctly argued" in the opening brief. *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (internal quotation marks omitted). We see no reason to deviate from our usual practice in this case. We therefore conclude that the EEOC has waived its record-keeping claim on appeal.

## Conclusion

We hold that the district court correctly granted summary judgment to the defendants and third-party defendants and that the EEOC has waived on appeal its record-keeping claim. We also hold that the district court acted within its discretion in denying the EEOC's motion to supplement the record.

**AFFIRMED.**